# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. _____

PEDIATRIX MEDICAL GROUP OF
FLORIDA, INC., PEDIATRIX MEDICAL
GROUP, INC., MEDNAX SERVICES,
INC., and MEDNAX, INC.,

       Plaintiffs,

v.

AETNA INC., AETNA HEALTH
MANAGEMENT, LLC,

       Defendants.

_____/

## **COMPLAINT**

     Plaintiffs Pediatrix Medical Group of Florida, Inc. ("PMG of Florida"), Pediatrix Medical

Group, Inc. ("Pediatrix"), MEDNAX Services, Inc. ("MSI") and MEDNAX, Inc. ("MEDNAX"),

file this Complaint against Defendants Aetna Inc. and Aetna Health Management LLC

(collectively, "Aetna"), and allege as follows:

## **NATURE OF THIS ACTION**

     1.    This case is about a large medical insurer that, motivated by a desire for ever-

increasing profits, seeks to improperly interfere with the medical care provided by PMG of

Florida's physicians to our country's most vulnerable population:  critically ill and premature

newborns.  This lawsuit seeks to protect PMG of Florida's physicians and the newborns that they

serve and save.

     2.    MSI and its affiliated medical practices collectively employ physicians who

provide state-of-the-art care to approximately 25% of these premature and/or critically ill

newborns born in the United States every year. PMG of Florida holds professional services agreements with hospitals in the state of Florida to provide neonatal services to the neonatal intensive care units ("NICUs") within those hospitals. PMG of Florida bills third-party payors, such as Defendants, for such services under insurance policies that cover the "medically necessary services" PMG of Florida's physicians provide to the newborns. Aetna is an insurance company that is attempting to increase its profit margins by reducing the amount and quality of medical care that PMG of Florida provides.

3.      This story begins in 1979, when Pediatrix Medical Group, Inc. was founded. Pediatrix Medical Group, Inc. employed only two physicians, both of whom practiced neonatology in the state of Florida. It had a single mission: "Take great care of the patient."

4.      Pediatrix is the owner of PMG of Florida.

5.      MSI manages numerous medical practices around the country, of which PMG of Florida is included, which employ a total of 4,000 physicians, about 1,000 of whom provide medical care in NICUs. MSI provides extensive services to its affiliated practices, such as access to a proprietary electronic health records system that physicians use to record the care provided, support for billing, and access to educational materials and training and auditing teams that promote compliant billing practices for neonatal services.

6.      PMG of Florida delivers medically necessary services to its patients. To code and bill for its services, PMG of Florida uses the Current Procedural Terminology ("CPT") promulgated by the American Medical Association ("AMA"). CPT is a uniform coding system used by physicians and other clinical providers to code for professional services that they render to their patients. CPT provides a level of consistency when coding medical services. The CPT codes are comprehensive and provide codes for all professional services rendered. CPT Codes are

2

not absolutely rigid in their application.  CPT takes into consideration a physician's professional judgment of the care that is rendered at the bedside and the patient's clinical condition.

7.     MSI has implemented a comprehensive program to ensure that its affiliated medical practices and the physicians who are employed by those practices code and bill in a compliant manner for their professional medical services.

8.     MSI has formed a Neonatal/Hospital-Based Coding Committee (the "Committee") that is composed of the country's leading experienced neonatologists, all of whom are familiar with CPT and its application in the NICU.  The Committee develops and publishes guidelines aligned with CPT guidance for use by neonatologists when selecting CPT codes.

9.     MSI has developed a proprietary electronic health records platform called BabySteps, which includes an automated coding tool developed to promote consistency in coding practices.  BabySteps ensures that the CPT code selected is appropriately supported with clinical documentation, and it reviews the clinical provider's electronic medical record entries to make sure that clinical documentation exists to comply with the selected CPT codes.

10.     MSI has created written materials to educate its affiliated physicians about proper CPT coding practices.  These materials are based on industry-leading guides, including CPT, American Academy of Pediatrics ("AAP") and AMA Related Publications, AAP Coding Training Vignettes, Coding Guidelines, and internally developed coding guidance updated annually.

11.     MSI has conducted educational initiatives around the country designed to teach clinical providers compliant use of CPT, which are led by MSI's Vice President of Medical Coding and eight full-time Regional Coding Educators.  They conduct face-to-face and electronic sessions with the clinical providers, host annual and regional medical directors' meetings and quality forums, and present at formal educational seminars.

12.     MSI has a Medical Coding Department that supervises the daily coding activities performed at the affiliated practice level.  Separately, the Medical Coding Department conducts internal coding audits to ensure compliance with CPT coding guidelines.  The Medical Coding Department employs professionals with significant experience in neonatal coding—including the Vice President of Medical Coding and twenty-one Certified Professional Coders, many of whom are certified as coding auditors by the American Academy of Professional Coders.

13.     MSI has a Revenue Cycle Management Department that monitors every claim submitted to third-party payors, including the Defendants.  It monitors the claims to ensure, among other things, that the medical documentation supports the claims being submitted.  The Revenue Cycle Management Department uses a set of approximately 100 written policies and procedures, as well as a leading industry software program called Claims Manager, to review the claims for accuracy.

14.     MSI's approach to coding, billing, and data retention is rooted in transparency.  Subject to HIPAA and other privacy regulations related to de-identification of medical records, MSI has made the information about care that is delivered by the practices it manages available for the world to see and learn from, including, upon request, by the government, public health agencies, and other researchers.

15.     MSI's affiliated medical practices share this information because they are focused on the quality of care that they deliver and their efforts to improve the overall health for the population of patients that they serve.  By contrast, Aetna's singular focus is on increasing its profitability, even at the expense of the patients for whom MSI's affiliated medical practices provide critical care services.  Despite the extensive coding and billing protocols, guidelines, and practices that MSI has adopted, Aetna, as a pretext for seeking to increase its profits, claims that

4

MSI has not done enough. Aetna has wrongfully accused MSI's affiliated medical practices of improperly coding for the care provided to their patients, asserting, without reliable support or documentation, that they engage in improper coding. Aetna has also accused the medical practices of providing too much care to their patients.

16. Aetna's accusations are not backed by a review of medical records. Nor are they backed by specific examples of impropriety. Rather, Aetna has attacked MSI and its affiliated medical practices and sought to recoup payments that it made to those affiliated medical practices by performing a deeply flawed mathematical evaluation, called a regression analysis, of MSI's affiliated medical practices' claims data. Aetna's accusations are baseless.

17. This is not the first time Aetna has sought to impose its profit-seeking motives on the delivery of medical care without regard for the physicians who deliver the care or the patients who need it. CNN reported in January 2018 that Aetna's medical director recently testified under oath that he refused to review patients' medical records before denying them health care for which they sought coverage under Aetna's insurance policies. This disturbing practice has sparked outrage and investigations around the country, including statements from prominent physicians and regulators describing Aetna's practices as outrageous and potentially illegal. Aetna's attack of MSI and its affiliated practices is just another unfortunate and disturbing example of Aetna's practice of placing profits before patient care.

18. PMG of Florida brings this lawsuit to protect its physicians and their patients, who face grave danger if Aetna succeeds in decreasing or eliminating the care that these premature and/or critically ill newborns require. PMG of Florida also brings this lawsuit because Aetna has falsely accused PMG of Florida of sending fraudulent medical bills to Aetna. Aetna's greed must yield to the medical judgment of PMG of Florida's physicians and the preservation of their

patients' health. The Court should declare that PMG of Florida has engaged in proper coding and billing regarding claims that it submitted to Aetna, and the Court should hold Aetna responsible for its unfair business practices, breach of contract, and bad faith.

## PARTIES

19. Pediatrix Medical Group of Florida, Inc. is a Florida corporation with its principal place of business in Sunrise, Florida.

20. Pediatrix Medical Group, Inc. is a Florida corporation with its principal place of business in Sunrise, Florida.

21. MEDNAX Services, Inc. is a Florida corporation with its principal place of business in Sunrise, Florida.

22. MEDNAX, Inc. is a Florida corporation with its principal place of business in Sunrise, Florida.

23. Aetna Inc. is a Pennsylvania corporation with its principal place of business in Hartford, Connecticut.

24. Aetna Health Management LLC is a Delaware limited liability company with its principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

25. The Court has personal jurisdiction over Aetna Inc., a non-resident, because Aetna purposefully availed itself of the privileges and benefits of conducting business in Florida by regularly doing or soliciting business in Florida.

26. The Court has personal jurisdiction over Aetna Health Management LLC, a non-resident, because Aetna Health Management LLC purposefully availed itself of the privileges and benefits of conducting business in Florida by regularly doing or soliciting business in Florida.

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that complete diversity of citizenship exists between Plaintiffs and Defendants. Specifically, Plaintiffs are citizens of Florida and Defendants are citizens of different states.

28.     The amount in controversy in this suit exceeds $75,000 exclusive of interests and costs.

29.     Venue is proper in this District because: (i) pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to the claims occurred in this District; (ii) upon information and belief, Defendants regularly do or solicit business in this District; and (iii) pursuant to 28 U.S.C. § 1391(b)(3), Defendants are subject to personal jurisdiction in this District with respect to this action.

## FACTS

**I.     MSI's Affiliated Medical Practices are the Nation's Leading Providers of Medical Care.**

30.     MSI (under a former name) was founded in 1979 as a single practice composed of two neonatologists.  These physicians had one mission:  "Take great care of the patient."

31.     Nearly four decades after its founding, MSI has grown into a national medical group with over 4,000 affiliated physicians practicing medicine in a majority of the 50 states.  MSI has more than 300 affiliated practice groups that span neonatal, maternal-fetal, pediatric sub-specialty medicine, radiology, and anesthesiology.  MSI and its affiliates employ over 15,000 people, have over 8,000 clinicians, and provide NICU care nationally through nearly 400 contracts the affiliates have entered into with health care facilities.

32.     MSI has achieved national recognition and accreditations for the quality of its affiliated clinical providers and clinical quality initiatives.

33.     The MSI Center for Research, Education, Quality and Safety is accredited by the Accreditation Council for Continuing Medical Education (ACCME) to provide continuing education for physicians.

34.     The MSI Center for Research, Education, Quality and Safety is accredited as a provider of continuing nursing education by the American Nurses Credentialing Center's Commission on Accreditation.

35.     The MSI Simulation Program has provisional accreditation by the Society for Simulation in Healthcare.

36.     The MSI Corporate Credentialing Department successfully achieved recertification status by the National Committee for Quality Assurance.

## II.     MSI's Structure, Policies, and Procedures Are Designed to Promote Accurate Billing and the Delivery of State-of-the-Art Medical Care by its Affiliated Medical Practices.

### A.     Management Services.

37.     MSI is a management company that provides management services to its affiliated medical practices.  It ensures that its affiliated physicians exercise independent medical judgment, without interference, when delivering care to patients.

38.     The affiliated professional corporations and subsidiary corporations enter into professional services agreements with hospitals.  These professional services agreements set forth the contracting parties' duties and obligations and the services to be rendered to patients at the hospitals.

39.     PMG of Florida has entered into contracts with numerous Florida hospitals.

40.     The affiliated professional corporations and subsidiary corporations also enter into agreements with third-party payors, such as Defendants, under which the physicians and other clinical providers agree to provide "medically necessary services" to beneficiaries of that third-

party payor. In exchange, the third-party payor agrees to compensate the affiliated professional corporations and subsidiary corporations for providing those covered services ("Third Party Payor Agreements").

41.     PMG of Florida has entered into a Third Party Payor Agreement with Aetna Health Management LLC. Aetna agreed in the Third Party Payor Agreement to pay PMG of Florida for the provision of "medically necessary" services.

42.     The Third Party Payor Agreement is governed by Florida law.

**B.      PMG of Florida Uses Nationally Recognized Neonatal CPT Codes to Record the Medically Necessary Services that it Providers Provide.**

43.     PMG of Florida delivers medically necessary services to its patients. To code and bill for those services, PMG of Florida uses CPT.

44.     CPT is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify professional medical services and procedures furnished by physicians and other health care professionals. These health care professionals use CPT to identify professional services and procedures for which they bill public or private health insurance programs.

45.     The American Medical Association ("AMA"), through its oversight of CPT, makes all decisions regarding the addition, deletion, or revision of CPT codes. The AMA republishes and updates the CPT codes annually.

46.     The first edition of CPT was developed and published by the AMA in 1966. The 1966 Manual contained four-digit codes with brief descriptions that did not closely correlate to modern day CPT codes.

47.     The second edition, published in 1970, began to approximate the current coding manual. It contained guidelines to various sections, five-digit codes, and two modifiers.

48. A third edition was published in 1973, adding more modifiers, starred procedures, and an appendix of deleted codes.

49. The fourth edition appeared in 1977.

50. CPT is still in its fourth edition. The AMA updates the CPT annually, with 400-700 changes that are effective at the beginning of each year.

51. CPT is divided into several coding families that encompass the specific care being provided to the patient. For example, CPT code numbers 99201 through 99499 cover various "evaluation and management services." Within that range, as one example, CPT 99468 covers initial inpatient neonatal critical care, per day, for the evaluation and management of a critically ill neonate, 28 days of age or less.

52. The selection of a CPT code is left to the physician's discretion. A physician determines the appropriate CPT code by exercising his or her medical judgment of the patient's clinical condition, CPT guidance, and the type of professional services rendered.

53. CPT has evolved significantly since 1966, with clearer coding standards and new developments designed to promote consistency in coding.

54. However, physicians must still apply their medical judgment when selecting CPT codes. For example, certain CPT codes depend for their selection on inherently subjective criteria, such as whether there is a "high" probability of "imminent" or "life threatening" deterioration in the patient's condition. This particular standard distinguishes between the selection of a "critical care" CPT code, if there is such a high probability, and an alternative code for "continuing intensive care services," if there is not.

C.    **MSI's Neonatal/Hospital-Based Coding Committee Has Developed State-of-the Art Coding Processes for Applying CPT Codes for NICU Services.**

55.    CPT does not clearly and objectively define every clinical encounter.  MSI therefore formed several coding committees, each of which has experts who are familiar with CPT for a particular subspecialty of medical care.  The coding committees develop and publish guidelines that MSI's affiliated medical practices and those practices' physicians may consider when selecting CPT codes.

56.    MSI's Neonatal/Hospital-Based Coding Committee operates by charter and meets at least twice annually.  The Committee provides guidance and oversight for the full scope of neonatal coding matters.  The Committee has seven members, five of whom are neonatologists.

57.    The neonatologists all have expertise in the application of CPT, knowledge of neonatal AAP publications related to neonatology, and knowledge of other guidance published by the Centers for Medicare & Medicaid Services ("CMS").  The neonatologists also have deep experience practicing neonatology and caring for critically ill and premature newborns.

58.    The Chair of the Committee is a board-certified neonatologist who served as the medical director of a Florida neonatology practice for 26 years, has been a certified professional coder since 2010, is the Company's Vice President of Medical Coding, and is a member of both the AAP Perinatal Coding Committee and the AAP Committee of Coding and Nomenclature.

59.    The Chair has also recently been appointed to serve on the AMA's Digital Medicine Payment Advisory Group and was recently selected to be the Chairman of the AAP's Committee on Coding and Nomenclature.  In his capacity as a member of the AMA's Digital Medicine Payment Advisory Group, he will provide subject matter expertise and assistance to AMA staff and physician leaders, including coding, valuation, coverage, and program integrity policies.  As Chairman of the AAP's Committee on Coding and Nomenclature, the member will collaborate

11

with the AMA and the Centers for Medicare & Medicaid Services on CPT and International Classification of Diseases ("ICD") code development, providing guidance to pediatricians on new and revised coding structures and final values for CPT codes.

60. The four other neonatologists who serve on the Committee have extensive experience with CPT and have each practiced medicine for two decades or more.

61. Two non-physician members also serve on the Committee: MSI's Chief Legal Officer and Chief Compliance Officer, and the National Vice President of Revenue Cycle Management. These members do not vote on CPT Guidelines. Rather, these members bring their extensive legal, compliance and claims processing backgrounds to the Committee's work to ensure that the Committee operates according to best compliant coding practices.

62. The Neonatal/Hospital-Based Coding Committee has three primary responsibilities: (a) designing, maintaining, and updating a decision framework that guides the proper selection of CPT codes, (b) creating educational materials for the affiliated clinical professionals, and (c) monitoring the affiliated practices to ensure compliance with industry coding guidance.

      **1.**     **The Decision Framework: The Neonatal/Hospital-Based Coding Committee has created MSI's coding decision framework, which promotes careful documentation, accurate coding, and high-quality medical care.**

63. The Neonatal/Hospital-Based Coding Committee meets regularly to discuss the clinical issues raised by the practice of neonatology and the application of CPT to coding for neonatal services. The Committee discusses sample cases, the appropriate CPT codes to be applied in those cases, and guidelines that should inform physicians who are responsible for selecting CPT codes.

64.     Based on these extensive discussions, the Committee developed coding guidance based on CPT for use at PMG of Florida and the medical practices affiliated with MSI.  The Committee authors and then votes on the CPT-based guidelines.  Each specific guideline must receive unanimous physician-member support to be adopted.

65.     The Committee's Guidelines reflect its judgment that an infant with particular clinical markers meets the CPT requirements for the CPT code suggested by the Guidelines.  For example, an infant who receives conventional ventilation, dopamine infusion, or cardiopulmonary resuscitation (with chest compressions) will qualify for the CPT code associated with the delivery of "critical care."

66.     The CPT-based Guidelines provide a blueprint for MSI's proprietary electronic documentation platform, also known as BabySteps.  BabySteps puts the CPT Guidelines into action.  It is an automated coding tool developed to promote consistency in coding practices.  MSI introduced the first version of its electronic health record system in 1996.

67.     BabySteps is installed on the computers at numerous hospitals where medical practices associated with MSI provide clinical services.  It provides a template for effective documentation.  Specifically, the physician delivers medical care to a patient.  The physician records the services that he or she provided in the patient's electronic health care record in BabySteps.  BabySteps then suggests a CPT code if the clinical markers indicated in the physician's notes and entries reflect an illness and treatment that clearly meet CPT criteria.

68.     BabySteps does not suggest a CPT code for every single scenario.  BabySteps' CPT code suggestions are not rigid.  The physician's medical judgment always takes precedence.  The bedside physician makes the ultimate coding decision and may override a coding suggestion made by BabySteps if the physician believes that a different code more accurately captures the care

provided and the state of the infant's health. BabySteps promotes accurate CPT coding: it requires accurate and thorough physician documentation, facilitates extensive documentation to ensure that the CPT code selected is appropriately supported, and searches the physician's electronic notes for clinical markers to suggest proper CPT codes.

69.     No Committee members' compensation is tied to the CPT codes entered into BabySteps. The members are isolated from financial influence. MSI imposes rigid divisions between the compensation paid to the physicians who select CPT codes and members of the Neonatal/Hospital-Based Coding Committee so that Committee members base the CPT Guidelines and the BabySteps algorithm on best medical practices, not their business judgment or business interests.

> **2.     Educational Materials: The Neonatal/Hospital-Based Coding Committee creates leading educational materials for MSI's affiliated medical practices and their physicians**.

70.     The Neonatal/Hospital-Based Coding Committee also creates written materials to educate PMG of Florida and other physicians whose practices whose practices are affiliated with MSI about proper CPT coding practices. Its materials are based on industry-leading guides: CPT, AAP and AMA Related Publications, AAP Coding Training Vignettes, Coding Guidelines, and internally developed coding guidance. The Committee regularly reviews and updates these educational materials.

71.     MSI does not place internal security or password restrictions on its educational materials or on the way in which employees access them. The information is memorialized in writing and is made available electronically and in hardcopy to a significant number of physicians and employees around the country. MSI has nothing to hide.

72.     The Committee oversees the educational initiatives around the country that use these materials. The Vice President of Medical Coding and eight full-time Regional Coding

Educators use the materials to educate the neonatologists and other clinical providers affiliated with MSI. They conduct face-to-face and electronic sessions with the providers, host annual and regional medical directors' meetings, and present the materials at formal educational seminars.

73.     The Vice President of Medical Coding and the Coding Educators also identify specific practices and providers for educational opportunities based on audits of their coding.

74.     MSI's certified coders receive annual training using the Committee's educational materials. The medical directors at MSI affiliated medical practices are also trained periodically. MSI trains newly hired physicians at its affiliated medical practices to code their services in a compliant manner.

### D.     The Medical Coding Department Provides Yet Another Layer of Review to Ensure Compliant Coding.

75.     The Medical Coding Department supervises the daily coding activities within MSI and, separately, conducts internal audits to ensure compliance.

76.     The Medical Coding Department employs professionals with significant experience in neonatal coding. The Department is led by the Vice President of Medical Coding and employs twenty-one Certified Professional Coders, including auditors certified by the American Academy of Professional Coders. The Department also employs eight medical coding educators, all of whom are certified coders with auditing and training expertise.

77.     The Department oversees the CPT coding performed by clinical providers on a daily basis. For example, BabySteps contains internal settings that inform the Department when a coding event must be reviewed. BabySteps notifies the Department if a physician selects a CPT code that is different from the CPT code suggested by BabySteps. The Department is also notified if BabySteps is unable to suggest a CPT code to the physician based upon the available information

and the physician then selects a code based upon his or her judgment of the patient's clinical condition and treatment.

78.     The Department reviews these situations through the "E-Mail Loop," which is MSI's internal process of deploying its team of certified coders to review a coding event.  When BabySteps triggers the E-Mail Loop, one of the Department's certified coders reviews the medical record, reviews the code selected, and then contacts the physician if the coder believes that the physician should have selected a different CPT code.  In those circumstances, the coder will ask the physician to consider an alternative code and explain the reasons for the proposed alternative.

79.     If a physician disagrees with the coder's suggestion, then the Vice President of Medical Coding will review the facts and resolve the dispute by selecting the code that he believes is correct.  If one of the codes being proposed would result in higher billing, the Vice President is required to select the code that will result in a lower bill for the services provided.  At no time is a higher code used if the physician at the bedside disagrees.

80.     MSI created this process to promote compliant, consistent and accurate coding.  The process ensures that coding specialists constantly review codes for accuracy.  Further, it ensures that coding specialists regularly interact with physicians to understand and confirm the accuracy of any codes that deviate from BabySteps' suggestions.

81.     The physicians at MSI's affiliated medical practices have the ability to enter the appropriate CPT codes consistent with their medical judgment.  They must confirm their agreement, or not, with BabySteps' suggested code every time a coding event occurs.  Nonetheless, BabySteps is a state-of-the-art tool that leads the industry in accurate coding.

82.     In addition to servicing the E-Mail Loop, the Medical Coding Department also uses the electronic data captured by BabySteps to audit the physicians' coding practices.  The

Department reviews the CPT codes entered into BabySteps against the physicians' medical record documentation to ensure coding compliance, completeness of the record, and adherence to the coding guidelines found in the AMA's CPT, ICD-10, the AAP's Coding Guidelines, and the CMS's 1995/1997 Documentation Guidelines.

83. The Medical Coding Department also conducts this review to confirm that the physicians have ordered and performed only medically necessary services. In these audits, the Department's review of the medical records is extensive. Among other things, the Department evaluates the service levels, the presence of the provider's signature, the selection of the diagnosis code, the legibility of documentation, that the provider and the billing physician's signature match, the documentation of any referring physicians, the accuracy of the ICD-10 code, the correct bundling of codes, the documentation of time, the presence of all progress notes, and the quality of documentation.

84. These audits are done periodically, practice by practice, to evaluate and ensure consistent compliance with CPT and Coding Committee Guidelines. The audits are reviewed by the Vice President of Medical Coding and the appropriate Regional Operations Team and Practice Clinical Leadership.

**E.** **MSI's Revenue Cycle Management Department Provides the Next Layer of Internal Review and Control to Ensure Compliant Billing.**

85. MSI's Revenue Cycle Management Department ("RCM") completes the medical billing process. RCM has six regional offices located throughout the United States and Puerto Rico, each with dedicated full-time employees.

86. RCM's primary mission is ensuring that every claim submitted to a third-party payor, including the Defendants, is "clean." A "clean" claim is submitted timely to the payor and has every field on the claim form completed consistent with each payor's specific requirements,

verified demographic and insurance information, matching CPT and ICD-10 codes, no "bundled" CPT codes billed separately, and medical documentation that supports the charges.

87.     RCM carries out its mission in two ways.  First, it follows a carefully crafted set of approximately 100 written policies and procedures that govern its review and approval of claims. MSI monitors RCM's compliance with these policies.  For example, every regional office is audited 90 days after the issuance of a new or revised policy and procedure.

88.     Second, RCM uses a software product called Claims Manager that contains over 3,000,000 coding relationships.  The product was tailored to include company-specific and payor-specific rules that ensure MSI complies with all applicable billing requirements.  For example, Florida Medicaid does not allow billing or payment of a discharge code (CPT codes 99238 or 99239) in a newborn place of service.  Claims Manager has a built-in "edit" that will auto-delete such a charge before the claim is submitted to Florida Medicaid and add code 99462 if fewer than two 99462 codes are billed after code 99460.

89.     New edits are created or updated based upon Medicaid Bulletins, review of payor denials, or when new states are added to the system.  The majority of Claims Manager's "edits" are for CPT and National Correct Coding Initiatives ("NCCI") entries.

90.     All MSI's charges pass through the Claims Manager's edit tool.  If Claims Manager does not delete a specific charge, then the charge moves forward in MSI's process to billing.  If the charge hits an "edit," however, a flag is raised and the charge will be held until it is reviewed for accuracy.

91.     Claims Manager generates a daily report that identifies all the charges that raised a billing flag.  RCM's employees then review the billing edits for accuracy and make any changes to the charge line that are necessary to comply with the applicable laws and rules.

92.    RCM has a comprehensive employee training program.  It has dedicated employees for staff training and development.  The staff meets monthly to update training materials, train on policies and procedures, and develop new training initiatives.

93.    RCM's new hire training program includes five days of one-on-one training with the regional trainer; a checklist for consistent, thorough training; a hard copy of the training manual; 25 days of on-the-job training with the head of the department team; a review of performance at 30 days and, if necessary, assigned additional training; ongoing staff training and development; focused training at staff meetings; new and revised policy and procedure training; and mandatory training in conjunction with any system upgrades, new automation, or based on audit results.

94.    MSI does not place internal security, password, or access restrictions on the materials RCM uses to carry out its responsibilities.  The information is memorialized in writing and is made available electronically and in hardcopy to RCM's entire staff around the country.

95.    RCM also has an auditing team that performs employee quality audits, billing workflow audits, and audits regarding adherence to policies and procedures.  RCM conducts billing workflow audits to ensure operating controls are working as intended, any "holds" on bills are timely resolved, and charge entries are accurate.

III.    **MSI's Procedures Reflect its Good-Faith and Transparency in the Delivery of Care, and its Mission to Improve Public Health.**

96.    MSI's procedures have improved the delivery of care at the medical practices affiliated with MSI.

97.    MSI starts its clinical quality improvement projects by identifying a pressing outcome concern that must be addressed. The quality improvement team, with consultation from

several medical directors, reviews the literature, defines the appropriate evidence necessary to support the project, and builds a toolkit.

98. The toolkit contains reprints of key publications from the literature, slide presentations for the medical and nursing staffs, an operations manual that describes the methodology for rolling out the project, and any ancillary materials needed for project management.

99. MSI posts the toolkits on a MSI website for participating practices to review. The toolkits do not represent specific recommendations on how to practice medicine, but rather provide a series of alternate approaches that may be valuable for NICUs looking to enhance their clinical quality outcomes.

100. Each practice has the ability to modify and tailor the toolkit to their particular unit's needs. Timelines are then established for projects, and projects are then initiated for practice groups that want to participate. The clinical data warehouse, which draws from the data entered into BabySteps, serves as the primary method of following outcome data. Having this sophisticated system promotes meaningful health care improvement and cost efficiency.

101. Subject to HIPAA and other privacy constraints, MSI has also made the data recorded by BabySteps available to the government and public health agencies, such as the CDC, in an effort to improve public health. The public health consequences of MSI's transparency have been life-altering for many patients. For example, the FDA contacted MSI in 2005 because it wanted to know the 30 most commonly used medications in the NICU. These data were available in the clinical data warehouse that is made possible by BabySteps. MSI sent the data to the FDA.

102. After further examination of the data, the FDA noted that three of the five most commonly used medications were antibiotics: ampicillin, gentamicin, and cefotaxime. These

drugs represented the two most common antibiotic regimens used for suspected sepsis, namely ampicillin and gentamicin, and ampicillin and cefotaxime. These two approaches were believed to be equivalent, with equal outcomes and equal risks.

103.     When MSI examined the outcomes in the clinical data warehouse in more detail, however, it discovered that the use of cefotaxime had nearly a twofold greater association with mortality at certain gestational ages than gentamicin in a patient population of more than 128,000 infants diagnosed with suspected sepsis.  Because of this risk, the use of cefotaxime for early-onset suspected septicemia has evolved, and use of this medication has fallen to an extremely low rate in participating NICUs across the country.  Lives have been saved.

104.     This type of observation, which otherwise might have gone unnoticed, became apparent only because BabySteps and the data in the clinical data warehouse made it possible to evaluate a sufficient number of patients and their treatments and outcomes.  This happened only because MSI is committed to transparency and to evaluating the data it collects to improve public health.

105.     MSI's clinical data warehouse keeps no secrets.  A typical clinical data warehouse report reveals fundamental data about the medical care provided by the physicians at MSI's affiliated medical practices:  the average daily patient census, the mortality rate, the average length of stay, the average ventilator days, median daily weight gain, and the number of patients on antibiotics—among dozens of other care indicators and services MSI's affiliated physicians coded and provided.

106.     Researchers can filter the database with virtually no limits.  They can filter by the timeframe the care was delivered, by the infant's weight and gestational age, by the specific service provided, and by certain data about the care such as the average length of stay over time.  The

information can be represented graphically.  It can be represented in a table.  The permutations are endless.

## IV.     AETNA Improperly Attempts to Extract Payments from PMG of Florida and Reduce the Quality of Care that PMG of Florida Delivers to Patients.

107.     Defendants are insurance companies with an incredibly lucrative business.  In fiscal year 2016, Aetna Inc.'s revenue equaled $63.175 billion.  Its net income that year exceeded $2 billion.  It had $38.94 billion in assets and total equity of $17.943 billion.  Its market capitalization is approximately $60 billion dollars.  The CEO's compensation in 2013 alone exceeded $30 million.

108.     Aetna has tremendous market power.  Upon information and belief, as of December 31, 2017, Aetna insures approximately 22.2 million medical members, approximately 13.4 million dental members, and approximately 13.8 million pharmacy benefit management services members.  This translates to a significant percentage of the insurance market.  For example, with respect to Medicare Part D, a government program to subsidize prescription drug costs, Aetna has 2.1 million members, or a 9.9 percent market share.  Aetna is the largest or listed within the top three largest insurance companies in more than a dozen states.

109.     Defendants do not provide any medical care to earn their profits.  Instead, they seek to profit by charging insurance premiums to their clients that, in the aggregate and after investment, exceed the cost of the clients' medical care for which the Defendants agreed to pay.

110.     This is not the only way in which Defendants have sought to profit.  Defendants have engaged in a systemic scheme to pressure and manipulate medical providers.  Using their sheer size and enormous market power, they threaten providers with frivolous lawsuits based on flawed statistical analyses of the providers' claims for payment.

111.    Defendants know their analyses are flawed and the results unsupportable.  They know they were contractually required to pay the medical providers the amounts already paid.  But Defendants do not care:  They seek to recover as much of the money back as they can squeeze from the medical providers.

112.    Defendants' scheme starts by retaining a lawyer who will conduct investigations outside the formal process of civil discovery using automated data assembly and analysis. Defendants use that lawyer, among other staff, to run deeply flawed regressions across medical providers' claims data.

113.    This process does not involve the review of medical charts to determine whether the medical providers delivered quality medical care or "medically necessary care."  Defendants do not care whether newborns were saved.  Defendants do not care what the medical charts reflect. Defendants do not concern themselves with the actual care being delivered.  Their sole motivation is to recover from or deny monies to the healthcare providers to reduce the costs of care that they must pay for—even justified and life-saving care— and increase their profit margins.

114.    Defendants and their lawyers then hire private investigators to locate and call the providers' former employees.

115.    The investigators do not reveal that they are working on behalf of Aetna in a legal dispute adverse to the provider.

116.    They do not ask whether the former employee is represented by an attorney.

117.    They do not instruct the former employee to avoid revealing privileged and confidential information.

118.    Defendants then present their skewed data to the relevant medical provider, twist information from the provider's former employees, threaten costly and devastating litigation,

23

inflict extensive legal fees, extort a payment from the provider to avoid litigation, and then move the scheme on to the next provider.

119.    Plaintiffs are targets of Defendants' scheme.  Without identifying a single problematic medical chart, Defendants have accused PMG of Florida of intentionally providing unnecessary care to NICU patients and coding the care provided at higher than justified levels. Defendants have accused PMG of Florida of billing for this improper care.

120.    Defendants have failed to identify a legitimate basis for their assertions.

121.    The care at issue that PMG of Florida provided to its patients was medically necessary.

122.    The payments Defendants made to PMG of Florida were required under its contract with Aetna.

123.    MSI engaged an outside coding expert to conduct a careful review of randomly selected medical charts.  The review demonstrated that the coding complied with the CPT coding standards in 100% of the charts reviewed.

124.    Nonetheless, Defendants are not satisfied.  They have attempted to pressure and manipulate MSI and its affiliates.  They have purported to file a writ of summons in Pennsylvania state court against MSI and several other affiliated entities—in violation of their contract with PMG of Florida and the contract with those entities.

125.    Defendants' efforts to circumvent their contractual payment requirements violate the terms of Aetna Health Management LLC's contract with PMG of Florida.  The contract is simple:  PMG of Florida will provide medically necessary services and, in exchange, Defendants will pay PMG of Florida for those covered services.  Defendants cannot pretend to comply with the contract by paying the claims PMG of Florida submits, but then demand a separate side

settlement payment in an effort to reduce the contractually required payments. This conduct is entirely improper and constitutes, among other things, a breach of the contract and the implied covenant of good faith and fair dealing.

126.    Defendants' conduct also threatens the public health and constitutes an unfair business practice. PMG of Florida has delivered the highest quality medical care to its patients—dangerously sick newborns. Defendants know that they are required to pay, in full, for the care that PMG of Florida has provided. Yet without conducting a reasonable investigation based on all available information, Defendants have attempted to employ back-door means to deny the insurance claims PMG of Florida submitted:  seeking in essence to recoup the payments made for prior claims through extortionate demands or frivolous litigation. These efforts, if successful, have the potential to reduce the amount of care medical providers deliver—out of fear that every single service, even if it is medically necessary, will become a data point in Defendants' baseless regression analysis and subsequent accusations of fraud.

127.    Defendants' focus on profit—not the patients' health or their medical care—is nothing new. CNN recently reported that California's Insurance Commissioner started an investigation into Aetna after Aetna's former Medical Director said under oath that he never looked at patients' medical records when deciding whether to deny or approve care.

128.    The Insurance Commissioner was reported as saying that it would be his expectation "that physicians would be reviewing treatment authorization requests," and that it was troubling to him that "during the entire course of time [the medical director] was employed at Aetna, he never once looked at patients' medical records himself." The Commissioner further stated, "[i]f the health insurer is making decisions to deny coverage without a physician actually

ever reviewing medical records, that's of significant concern to me as insurance commissioner in California – and potentially a violation of law."

129. CNN reported that members of the medical community expressed similar shock about Aetna's practices. Upon hearing the story, CNN reported that one professor of pediatrics and internal medicine at the Children's Hospital of Richmond exclaimed, "Oh my God. Are you serious? That is incredible."

130. Another prominent physician was reported as telling CNN that "[t]his is potentially a huge, huge story and quite frankly may reshape how insurance functions."

131. As a result of CNN's reporting, at least three additional states since have opened investigations into Aetna.

132. Aetna's conduct under investigation is emblematic of its approach toward MSI and its affiliates and other similarly situated medical providers: Defendants seek to line their pockets at the expense of the physicians and patients involved, without evaluating the care being provided.

## COUNT 1: DECLARATORY JUDGMENT (REGARDING AETNA'S REGRESSION)

133. Plaintiffs incorporate the above allegations in paragraphs 1 through 132 as if they were fully stated here.

134. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201, et seq., to declare the rights and legal relations of the parties. The sole basis for Defendants' accusations is a regression analysis of PMG of Florida's reimbursement claims, which did not involve a review of the underlying medical charts to determine the medical necessity or quality of care provided by PMG of Florida on a case-by-case basis.

135. The care provided and how that care is coded and billed is always left to the medical judgment of the treating physician.

26

136. PMG of Florida and MSI have several structures and procedures in place to ensure that all care provided is coded compliantly by the treating physicians, including, for example:

    a. The "E-Mail Loop," which helps resolve any disputes or discrepancies in a physician's coding of any particular encounter;

    b. Regular audits of physicians' care and coding practices to ensure that the care is coded and billed at appropriately; and

    c. The BabySteps software itself, which was designed to suggest coding for each encounter that conservatively errs on the side of coding a lower service level and is the result of an extensive system of review by the neonatologists on MSI's Neonatal/Hospital-Based Coding Committee, who have extensive experience with CPT coding.

137. These structures and procedures work. The physicians at MSI's affiliated medical practices agree with the code BabySteps suggests nearly 100% of the time, and an outside coding experts' audit of randomly selected medical charts demonstrated that the coding complied with the CPT coding standards in 100% of the charts reviewed.

138. A present, ripe and justiciable controversy therefore exists regarding the validity and legality of Defendants' regression methodology to justify its accusations of alleged improper billing practices. The parties having a present antagonistic and adverse interest are before the Court.

**COUNT 2: DECLARATORY JUDGMENT (REGARDING MEDICAL NECESSITY)**

139. Plaintiffs incorporate the above allegations in paragraphs 1 through 132 as if they were fully stated here.

140. Under the terms of the Third Party Payor Agreements between the parties, Defendants agreed to compensate PMG of Florida for "medically necessary services" provided by PMG of Florida to the Defendants' insureds.

141. All the care PMG of Florida provided to Defendants' insureds was medically necessary and coded and billed at the appropriate service level.

142.    MSI's and PMG of Florida's systems and procedures are specifically designed to ensure that the care that PMG of Florida provided was medically necessary and coded and billed at the appropriate service level.

143.    The medical charts demonstrate that the physicians provided and billed only for medically necessary care.

144.    Defendants, however, have accused PMG of Florida of providing medically unnecessary services and coding and billing these services at higher levels than justified.

145.    A further, present, ripe and justiciable controversy therefore exists regarding whether (a) the care provided by PMG of Florida to Defendants' insureds was medically necessary and was coded and billed at the appropriate level of care, (b) PMG of Florida complied with the terms of the Third Party Payor Agreement, (c) Defendants were required to compensate PMG of Florida for the care provided, and (d)  Defendants are entitled to recoupment or reimbursement for the payments made to PMG of Florida.  The parties having a present antagonistic and adverse interest are before the Court.

## COUNT 3:  BREACH OF CONTRACT

146.    Plaintiffs incorporate the above allegations in paragraphs 1 through 132 as if they were fully stated here.

147.    PMG of Florida has entered into a Third Party Payor Agreement, a valid and enforceable written contract that obligates Aetna Health Management, LLC to compensate PMG of Florida for medical services provided to Defendants' insureds.

148.    PMG of Florida has honored its obligations under the Third Party Payor Agreement because, among other things, PMG of Florida provided "medically necessary services" to

Defendants' insureds, coded and billed those services at the appropriate levels, and sought compensation from Defendants for those covered services in the required time, form, and manner.

149.     Under the Third Party Payor Agreement, Defendants were obligated to compensate PMG of Florida for those services.

150.     Defendants have materially breached their obligations under the Third Party Payor Agreement to compensate PMG of Florida for properly submitted and valid claims.  Defendants have circumvented their contractual obligation to pay PMG of Florida by seeking to rescind the payments PMG of Florida is entitled to receive, and did legitimately receive.  Defendants have done so by baselessly accusing Plaintiffs of intentionally providing unnecessary care to NICU patients and coding and billing the care provided at higher than justified levels, threatening Plaintiffs with a frivolous lawsuit, and improperly demanding payments in exchange for an agreement to forego litigation.

151.     As a direct and proximate result of Defendants' breaches of the Third Party Payor Agreement, including the costs of defending against Defendants' baseless accusations, the Plaintiffs have suffered unliquidated damages in an amount to be determined at trial, and within the jurisdictional limits of this Court.

**COUNT 4:  BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

152.     Plaintiffs incorporate the above allegations in paragraphs 1 through 132 as if they were fully stated here.

153.     Upon execution of the Third Party Payor Agreement, the parties were bound by an implied duty of good faith and fair dealing.

154.     An implied duty of good faith and fair dealing also arises from the special relationship between Defendants, as a health insurer, and PMG of Florida, as Defendants' insureds' medical providers through PMG of Florida.

155.     The duty of good faith and fair dealing also arises from Defendants' obligation to pay PMG of Florida for the medical services provided to patients pursuant to the Third-Party Payor Agreement. The duty of good faith and fair dealing required Defendants not to engage in acts of bad faith and not to act unreasonably.

156.     Defendants acted in bad faith and breached their duty of good faith and fair dealing by baselessly accusing Plaintiffs of intentionally providing unnecessary care to NICU patients and coding and billing the care provided at higher than justified levels, and threatening Plaintiffs with a frivolous lawsuit premised on these unjustified accusations.

157.     Defendants acted in bad faith and breached their duty of good faith and fair dealing by seeking to recover claims payments made to PMG of Florida, to which PMG of Florida was contractually entitled; by threatening frivolous litigation; and by making other meritless accusations of wrongdoing.

158.     Defendants' actions were intended to deprive PMG of Florida of the benefits to which it is entitled under the Third-Party Payor Agreement and to extract additional payments from PMG of Florida for which Defendants were not entitled under the agreement.

159.     Defendants made these accusations and threats knowing they are both frivolous and premised on a flawed regression analysis of PMG of Florida's claims for payment. Defendants also failed to review any of the relevant medical records before demanding these payments from PMG of Florida. Defendants' conduct was intentional and undertaken in willful and wanton disregard of PMG of Florida's rights and interests.

160.     As a direct and proximate cause of this conduct, PMG of Florida suffered damages in an amount to be determined at trial.

## COUNT 5:  BUSINESS DEFAMATION

161.     Plaintiffs incorporate the above allegations in paragraphs 1 through 132 as if they were fully stated here.

162.     Defendants, acting intentionally, made defamatory statements about Plaintiffs' economic interests, particularly regarding PMG of Florida and the quality of the services PMG of Florida provided, including statements that PMG of Florida provides medically unnecessary care to its patients and systematically codes and bills for care it provides at unjustified levels.

163.     Defendants' defamatory statements were false, inaccurate, or misleading and were published to one or more third parties, including Justin Jacobs and Angela Blackburn.

164.     Defendants' defamatory statements were not privileged and were made without justification.

165.     Defendants published these defamatory statements containing false, inaccurate, or misleading information with malice and with the intent to cause harm to Plaintiffs' business, with either the knowledge that the statements were false, inaccurate, or misleading or, at the least, with reckless disregard for the truth.

166.     Defendants' statements were defamatory in that they called into question the quality of Plaintiffs' services and impugned the integrity of its medical providers.

167.     As a direct and proximate result of Defendants' defamatory statements published to third parties, Plaintiffs has been harmed and incurred special damages in an amount to be proven at trial.

Case 2:18-cv-02217-WB Document 15-3 Filed 06/29/18 Page 33 of 34

**JURY DEMAND**

168.    Plaintiffs demand a jury trial of all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, for these reasons, Plaintiffs pray that this Court enter judgment in favor of

Plaintiff and against Defendants as follows:

- Actual damages;

- Exemplary damages;

- Pre-judgment and post-judgment interest;

- Court costs;

- Attorneys' fees;

- A declaration that (a) Defendants' regression methodology is invalid and illegal and does not justify its accusations of alleged improper billing practices; and (b)(i) the care provided by PMG of Florida to Defendants' insureds was medically necessary and was coded and billed at the appropriate level of care; (ii) PMG of Florida complied with the terms of the Third Party Payor Agreement; (iii) Defendants were required to compensate PMG of Florida for the care provided, and (iv) Defendants are not entitled to recoupment or reimbursement for the payments made to PMG of Florida; and

- All other relief to which Plaintiffs are entitled and is just and proper.


Dated: April 20, 2018

Respectfully submitted,

**LASH & GOLDBERG LLP**
Miami Tower, Suite 1200
100 Southeast Second Street
Miami, Florida 33131-2158
Telephone: 305-347-4040
Facsimile: 305-347-4050
*Attorneys for Plaintiffs*

By: /s/ *Martin B. Goldberg*
      **MARTIN B. GOLDBERG**
      Florida Bar No. 0827029
      mgoldberg@lashgoldberg.com
      **LORELEI J. VAN WEY**
      Florida Bar No. 0982792
      Lvanwey@lashgoldberg.com

Co-Counsel (Pro Hac Vice Motions to be Submitted):
**LUKE NIKAS**
lukenikas@quinnemanuel.com
**MICHAEL B. CARLINSKY**
michaelcarlinsky@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849 7000
Fax: (212) 849 7100
*Attorneys for Plaintiffs*

33