IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA INC., AETNA HEALTH, INC., AETNA HEALTH MANAGEMENT LLC AND AETNA LIFE INSURANCE COMPANY, <br><br>         Plaintiffs, <br><br> v. <br><br> MEDNAX, INC., PEDIATRIX MEDICAL GROUP, INC. AND MEDNAX SERVICES, INC., <br><br>         Defendants. | CIVIL ACTION <br><br><br> No. 18-2217 |

**MEDNAX'S OPPOSITION TO MOTION TO COMPEL
ADDITIONAL MEDNAX CUSTODIANS AND SEARCH TERMS**

CONRAD O'BRIEN PC
Howard M. Klein (No. 33632)
Robert N. Feltoon (No. 58197)
Andrew K. Garden (No. 314708)
Centre Square West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Ph: (215) 864-9600
Fax: (215) 864-9620
Email: hklein@conradobrien.com
        rfeltoon@conradobrien.com
        agarden@conradobrien.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael B. Carlinsky*
Jennifer Barrett*
Luke Nikas*
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Ph: (212) 849-7000
Email: lukenikas@quinnemanuel.com
        michaelcarlinsky@quinnemanuel.com
        jenniferbarrett@quinnemanuel.com

LASH & GOLDBERG LLP
Martin B. Goldberg*
Lorelei J. Van Wey*
Jonathan E. Feuer*
100 Southeast 2nd Street
Miami, FL 33131
Ph: (305) 347-4040
Email: mgoldberg@lashgoldberg.com
        lvanwey@lashgoldberg.com
        jfeuer@lashgoldberg.com

      * Admitted Pro Hac Vice

*Attorneys for Defendants Mednax, Inc., Pediatrix Medical Group, Inc., and Mednax Services, Inc.*

## TABLE OF CONTENTS

**Page**

Preliminary Statement ......................................................................................................1

Background ........................................................................................................................3

I.      Mednax Identifies Custodians Relevant To Aetna's Allegations And Agrees To
        Make Robust And Sufficient Production ................................................................3

II.     Prior To The Document Discovery Cut-Off, Aetna Demands That Mednax Add
        Two Categories Of Additional Custodians ...........................................................8

III.    Weeks After The May 1 Document Discovery Deadline, Aetna Demands For The
        First Time Dozens Of Additional Mednax Custodians ........................................9

IV.     The Test Searches Of The Finance Custodians Produced No Relevant Documents ........11

V.      Despite The Results Of Mednax's Searches, Aetna's Current Motion Continues
        To Demand Dozens Of Additional Custodians, Including New Categories Never
        Before Requested ................................................................................................12

Argument ........................................................................................................................13

I.      Aetna Fails To Identify Any Deficiency In Mednax's Custodians Or Demonstrate
        That The Additional Custodians Proposed Have Unique, Non-Duplicative,
        Relevant Documents ...........................................................................................14

        A.      Individuals Who Oversee Mednax's Financial Performance ..................15

        B.      Mednax's Chief Compliance Officer .....................................................15

        C.      Mednax's Medical Directors...................................................................16

        D.      Coding Committee Members ..................................................................17

        E.      Individuals Who Developed BabySteps Software ..................................18

II.     Aetna's Overbroad, Generic And Duplicative Search Terms Should Be Rejected ..........20

III.    Mednax Proposes A Compromise .......................................................................23

Conclusion ......................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Cases

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*,
   2015 U.S. Dist. LEXIS 110712 (D.N.J. Aug. 21, 2015)............................................... 14, 22, 23

*Family Wireless #1, LLC v. Auto Techs., Inc.*,
   2016 U.S. Dist. LEXIS 65885 (D. Conn. May 19, 2016)........................................................ 14

*Enslin v. Coca-Cola Co.*,
   2016 WL 7042206 (E.D. Pa. June 8, 2016) ............................................................................ 14

### Rules/Statutes

Fed. R. Civ. P. 26 ........................................................................................................................... 20

Fed. R. Civ. P. 26(b)(1).................................................................................................................. 20

Mednax submits this Memorandum in Opposition to Aetna's Motion to Compel Additional Mednax Custodians and Search Terms.

**PRELIMINARY STATEMENT**

Aetna's motion to add dozens of new document custodians is a fishing expedition based entirely on hypothetical assumptions. As Aetna admits, Mednax already has produced hundreds of thousands of documents in response to Aetna's allegations and document demands. But Aetna belatedly demands the addition of dozens of new custodians based on the naked speculation that billing complaints or other categories of documents *might* exist, and *if* they did, those documents *might* have been sent to the dozens of new custodians Aetna identifies. This Court should not impose significant additional costs on Mednax solely on the basis of Aetna's unsupported conjecture.

Contrary to Aetna's assertions, Mednax's document productions have been more than adequate. Throughout discovery, Mednax has made good-faith efforts to search for, identify, and produce documents relevant to the claims in Aetna's Complaint and Mednax's defenses. Mednax has identified the nine custodians, all with senior positions within Mednax, most likely to have relevant communications and documents regarding any alleged upcoding or overbilling, any complaints regarding the same, Mednax's coding education and training, and the process implemented by Mednax to identify correct codes based on information provided by physicians.

Mednax's good faith discovery efforts continued after the June 3 conference, where the Court instructed Mednax to perform a test search using the files of 13 "financial oversight" executives. According to the Court, the purpose of the "test" was to determine whether the searches would pull back any "important documents" and corroborate Aetna's putative need for such additional custodians or search terms beyond the custodians and terms that Mednax had already identified. Ex. 1, Transcript of June 3, 2019 Conference, at 15:19-16:5. The test

confirmed exactly what Mednax suspected:  it identified *zero* documents of import, let alone any documents showing that Mednax's "financial oversight" executives pressured any Mednax personnel to upcode or engage in other billing misconduct.  Moreover, as expected, Aetna's generic search terms produced thousands of false hits that, applied across the dozens of custodians Aetna demands, would massively increase the time and expense of discovery and substantially delay the completion of discovery and trial well past the Court's deadlines, including the deadlines recently set (Dkt. 123).  Ultimately, the test process validates what Mednax has said all along:  that it has already selected the most relevant custodians who have the files most responsive to Aetna's allegations and that those custodians' files, along with the central repository searches that Mednax has undertaken and continues to supplement, will provide Aetna will fulsome access to all relevant discovery in this case.

Nothing in Aetna's current Motion warrants reconsideration of the procedures the Court ordered at the June 3 conference.  Aetna has not met its burden of showing that the dozens of proposed custodians and overbroad search terms will uncover unique and relevant documents that would not already be captured by Mednax's existing custodians and search terms or produced from Mednax's searches of its central repository files.  Such central files include but are not limited to:  (a) hundreds of thousands of coding emails between Mednax's physicians and coding personnel referred to as the "Email Loop," in which coders and physicians communicate on a daily basis about potential changes to the codes recommended by Mednax's proprietary billing and coding algorithm known as "BabySteps" in order to ensure accurate and compliant coding; (b) the files of Mednax's Neonatal/Hospital-Based Coding Committee, which prepares Mednax's coding policies and guidelines, and training and education materials used to train its physicians and coders on compliant coding practices; (c) the files of Mednax's Medical Coding

Department, which supervises the company's daily coding activities; (d) the files of Mednax's Revenue Cycle Management Department, which supervises the company's daily billing activities; and (e) documents relating to the development and operation of the BabySteps software, including the "Decision Tree" that the software applies to select a recommended CPT billing code based upon inputted information about the medical treatment provided to the applicable Mednax patient. With the relevant custodians, Email Loop, and these central repository documents, Mednax has agreed to provide Aetna with discovery that covers all relevant aspects of its coding and billing practices.

Nevertheless, in the interest of putting an end to Aetna's harassing demands for additional custodians and terms, Mednax is willing to propose the following compromise: it will add an additional 8 "financial oversight" custodians to its custodian list (on top of the two "financial oversight" custodians that are already on Mednax's custodian list) and run a modified set of Aetna's search terms that drops several of Aetna's most generic terms across the files of the 8 additional "oversight" custodians and the other custodians Mednax has already identified, *if* Aetna will drop its demand for dozens of other irrelevant custodians and other overbroad, irrelevant, and duplicative search terms. Mednax believes this compromise is more than reasonable and will provide Aetna supplemental discovery into the only area that the Court to date has recognized as arguably warranting additional custodians and terms.

## BACKGROUND

### I.   MEDNAX IDENTIFIES CUSTODIANS RELEVANT TO AETNA'S ALLEGATIONS AND AGREES TO MAKE ROBUST AND SUFFICIENT PRODUCTION

Aetna's Complaint centers on the allegation that Mednax has a "culture" of "pressuring" its physicians to manually code at higher levels than necessary in order to overbill insurers like Aetna. Compl. ¶ 33. Aetna alleges that "Mednax has enforced its policy of upcoding" by

educating physicians to select higher codes than the ones suggested by BabySteps, by contacting physicians to pressure them to code higher, by incentivizing physicians with a compensation system tied to billings, and by having Mednax coders change billing codes to those with higher levels of reimbursement.  *Id.* ¶ 34.

On February 25, 2019, Mednax initially identified as custodians seven senior members of its management team, whose files would provide Aetna with the widest scope of responsive documents on the areas of discovery relevant to its allegations:

- **Robert Bryant**:  Former Senior Vice President and Chief Information Officer, whose files contain relevant information about the development and operation of Mednax's proprietary "BabySteps" coding software.

- **Jennifer Granberry**:  Chief Operations Officer, Revenue Cycle Management, whose files contain relevant information about Mednax's billing practices, policies and guidelines.

- **Darren Handler**:  Director, Data Warehousing, whose files contain relevant information about the technical development and operation of the BabySteps software.

- **Dr. David Kanter**:  Vice President, Medical Coding, whose files contain relevant information about Mednax's coding practice, policies and procedures.

- **Christine Lewandowski**:  Former Vice President, National Revenue Cycle Management, whose files contain relevant information about Mednax's billing practices, policies and guidelines.

- **Kathleen O'Hara**:  Director, Coding, whose files contain relevant information about Mednax's coding and operation of BabySteps.

- **Dr. Michael Stanley**:  Vice President, Clinical Initiatives, whose files may contain relevant information about Mednax's neonatal medical services and standards of care.

Ex. 2, February 25, 2019 Email from Jennifer Barrett.

By virtue of their executive roles, as well as their membership on relevant Mednax committees, these Mednax custodians possess the broadest, most relevant sets of communications and documents responsive to Aetna's allegations, for several reasons.  First, as a

result of their seniority and tenure with the company, these custodians have the most relevant information on coding and billing policy and would have information directly responsive to Aetna's allegation that Mednax instituted and perpetrated its fraud through a top-down, "corporate culture" of upcoding. Second, by virtue of their supervisory roles, these executives have the widest scope of communications within their business units, including emails and other communications with personnel they supervised. Third, these custodians were executive members of relevant coding and other committees and thus possess communications relevant to the establishment of Mednax's coding guidance, training and education. And, fourth, the custodians communicated regularly with practice group personnel, giving Aetna access to emails and communications with executives and physicians within the physician practice groups. Mednax has searched the files of each of these custodians and is producing relevant and responsive emails and other communications.

In addition to these custodians, Mednax agreed to review and produce Email Loop communications from individuals in the Medical Coding Department who are without question the most relevant custodians with respect to Aetna's core allegations. These custodians are the very Mednax coders, billers, and supervisors from the corporate office who allegedly implemented the culture of pressure and fraudulent coding upon which Aetna bases its claims. Contrary to Aetna's dismissive efforts to minimize Mednax's review and production of the hundreds of thousands of Email Loop communications between these custodians and Mednax's affiliated NICU physicians, these emails are specific, detailed, and substantive. And critically, they solidly refute Aetna's case, which explains Aetna's motivation for drastically increasing its dragnet in the hope of finding something to support its case.

As explained in prior briefing, the Email Loop is comprised of email communications between Mednax's certified coders and physicians commenced when a coder believes the billing code selected by the physician in Mednax's BabySteps system might be inaccurate when reviewed in conjunction with the medical record and clinical condition of the patient.  Dkt. 92, at 6-7.  A Mednax coder provides clinical information and asks questions to the physician if the coder believes an alternative billing code may be a more accurate reflection of the medical treatment provided, and in which the physicians in turn respond to and discuss the coders' suggestions.  Such communications go directly to the heart of Aetna's allegations that Mednax "pressured" physicians to upcode and misrepresent the care they had provided.  Compl. ¶ 36 (alleged that "coding and clinical charting were carefully reviewed at Mednax," "[i]f Mednax disagreed with the billing code triggered by the physician's clinical assessment," "Mednax pressured physicians to assess a patient at a higher level of severity than is clinically appropriate.").  Accordingly, at the outset of discovery, Aetna pressed Mednax to produce these documents on an expedited basis.  But once Mednax complied with this request by producing hundreds of thousands of Email Loop documents at substantial expense, Aetna apparently realized its central theory had no factual support.  Since then, Aetna has attempted to downplay the importance of this information and the substantial cost Mednax incurred to make these productions.  Mot. at 9.  The impact of the Email Loop communications on Aetna's case is demonstrated by the fact that, as discussed in prior briefing, Aetna is now advancing a brand new, unpled theory that the BabySteps system itself was designed to produce "upcoded" billing recommendations even without human actions.  Dkt. 92.

In addition to the Email Loop documents and documents from the seven Mednax document custodians, Mednax is also producing documents from critical central repositories

containing documents responsive to Aetna's demands. Mednax has searched its central repositories in good faith for, among other things:

- The files of the Neonatal/Hospital-Based Coding Committee, including meeting minutes, policies and procedures, and coding guidelines;

- The files of the Medical Coding Department;

- Files relating to the development and operation of BabySteps;

- Educational and training materials prepared by the Neonatal/Hospital-Based Coding Committee;

- Coding audit materials;

- The files of the Revenue Cycle Management Department; and

- Information about the compensation of its coders.

Through the files of the Neonatal/Hospital-Based Coding Committee and Medical Coding Department, Mednax is providing Aetna with the most relevant and responsive materials regarding its coding guidelines, policies and practices. Through the files of the Revenue Cycle Management Department, Aetna is being provided with the most relevant materials related to Mednax's billing policies and practices. Those documents also provide the most relevant discovery into Mednax's processes, practices, and procedures for educating and training personnel in respect of proper and compliant coding and billing practices.

Mednax is also providing Aetna with discovery into all relevant aspects of the BabySteps software. In addition to the Email Loop and other documents related to the operation and development of BabySteps, Mednax has also provided Aetna with the BabySteps "Decision Tree" so that Aetna can assess the accuracy of the codes recommended by this billing system. Mednax has also produced information regarding its coding audits, so that Aetna can assess the accuracy of Mednax's coding procedures. Mednax has also searched its compliance files in response to Aetna's request for information about internal complaints concerning Mednax's

coding and billing procedures.  Mednax has informed Aetna that, based upon its diligent search, it is not aware of any such complaints.  *See* Ex. 3, Mednax's Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, at No. 5.

This above information covers the complete range of relevant coding and billing discovery that Aetna's Complaint puts at issue.  To date, Mednax has produced nearly a million pages of documents covering these topics.

## II.    PRIOR TO THE DOCUMENT DISCOVERY CUT-OFF, AETNA DEMANDS THAT MEDNAX ADD TWO CATEGORIES OF ADDITIONAL CUSTODIANS

By order dated March 6, 2019, Judge Beetlestone required the parties to substantially complete document production by May 1, 2019.  Dkt. 62.  Prior to that deadline, the parties met and conferred as to Mednax's custodians.  During this meet and confer process, Aetna requested that Mednax add just two categories of custodians to the seven custodians Mednax had already identified:  "financial oversight" custodians and practice group corporate officers and directors.  When the parties were unable to reach agreement on this request, Aetna sought the Court's intervention at the April 26, 2019 hearing.  At the hearing, the Court directed Mednax to identify "significant decision-makers" with regards to the financial performance of the practice groups. Ex. 4, Transcript of April 26, 2019 Oral Argument, at 128:19-129:7.  As for the practice group officers and directors, the Court set aside Aetna's request, and directed the parties to further meet and confer. On May 9, in compliance with the Court's instruction, Mednax identified as custodians two of its most "significant decision-makers" regarding the "financial oversight" of the practice groups:  Chief Financial Officer Jason Clemens and Senior Vice President and Chief Accounting Officer John Pepia.

### III.   WEEKS AFTER THE MAY 1 DOCUMENT DISCOVERY DEADLINE, AETNA DEMANDS FOR THE FIRST TIME DOZENS OF ADDITIONAL MEDNAX CUSTODIANS

On May 21, weeks after the deadline for substantial completion of document discovery, Aetna made new demands for additional custodians.  *See* Ex. 5, May 21 Letter from Gregory S. Voshell, at 2; *see* Dkt. 95-1.  In  addition to 13 more "financial oversight" custodians (on top of the two—Messrs. Pepia and Clemens—that Mednax had already identified), Aetna informed Mednax for the first time that it was seeking to add as custodians: (1) Mednax's Chief Compliance Officer, who is Mary Ann E. Moore, Mednax's Chief Legal Officer; (2) 19 additional members of the Neonatal/Hospital-Based Coding Committee (in addition to the five Mednax had already identified as custodians); (3) 7 Medical Coding Educators; (4) a Coding Auditor Manager (Jamie Wilson); and (5) some unspecified number Mednax's practice group "medical" directors as custodians, which it also referred to confusingly as "practice group directors."[1]   In total, Aetna demanded dozens of new custodians, on top of the 9 custodians Mednax has already identified.

Although such request—which would require Mednax to more than quintuple the size of its custodian list weeks after the document discovery deadline has passed—was patently unreasonable (and entirely disproportional to Aetna's limited identification of just a dozen Aetna custodians), Aetna asked the Court at the June 3 conference to compel these additions.  Aetna also asked the Court to require Mednax to run a variety of generic, irrelevant and duplicative

---

[1]    Although in its May 21 letter Aetna did not disclose the specific number of such directors that it wished to add, Aetna's counsel later disclosed that there were potentially 180 Medical Directors at issue and that Aetna was seeking discovery from these directors over nearly a decade, between "2010 through 2018."  Ex. 1, Transcript of  June 3, 2019 Conference, at 6:14-7:12 ("Again, this is a nationwide -- this case is nationwide, so there are different individuals in charge of different geographic areas in the country. And then (indiscernible) directors who are, you know, very critical individuals . . . .  I think there are in total, Your Honor, something like 180 medical directors.").

additional search terms on all of these custodians, on top of the search terms that Mednax had already proposed and agreed to run on its custodians.

At the June 3 conference, the Court declined to grant Aetna's request. Instead it acknowledged the overly burdensome nature of Aetna's demand, especially in light of the amount of materials Mednax had produced in the case. Ex. 1, Transcript of June 3, 2019 Conference, at 10:16-19 ("It's overly burdensome and you've already produced a ton of stuff that's relevant to each of these categories."); *Id.* at 14:7-16 (acknowledging "MEDNAX's fairly comprehensive production of documents"). In respect of Aetna's belated, burdensome demands, the Court asked Aetna to narrow its request and identify its "top two" categories of custodians. *Id.* at 11:2-5 ("of your various categories, which are the top two that are most pressing right now, chief compliance officer and financial oversight?"). In response, Aetna's counsel identified the "practice group directors" and the "chief compliance officer." *Id.* at 11:6-12 ("I mean I think the practice group directors and chief compliance officer are very significant"). According to Aetna, such practice group directors and the Chief Compliance Officer were relevant because they were likely to have relevant information about "complaints from within the practice groups," and "fraud and abuse," respectively. *See* Ex 5, May 21 Letter from Gregory S. Voshell, at 2, 1; Mot. at 3 (the CCO and Medical Directors are the "individuals most likely to have received" complaints about billing).

In response to Aetna's narrowing, Mednax explained that the Chief Compliance Officer was Mary Ann E. Moore, Mednax's Chief Legal Officer, and that virtually all of her documents would be privileged, as she was always acting in her capacity as Mednax's attorney. Ex. 1, Transcript of June 3, 2019 conference, at 13:5-10 ("She is an attorney. She also filled the roll as the chief compliance officer. She has been directly supervising and directing this litigation ever

since it began. There is nothing that Ms. Moore would have in her files that would not be already privileged.").  Mednax also explained that, in any event, the company had conducted a search, including of its compliance files, and there were no complaints about NICU billing practices, rendering Aetna's requests moot.  *Id.*  at 13:11-16 ("Moreover, MEDNAX went through its records as a result of interrogatories and requests from Aetna to determine whether or not there were internal complaints about MEDNAX's coding or billing practices relating to NICU medical procedures during the relevant time period. And we were -- and we identified none. There weren't any.").

The Court accordingly set aside Aetna's request for documents from the Chief Compliance Officer.  *Id.* at 14-16.  The Court also did not further entertain Aetna's request for "practice group directors," as Aetna's inability to identify any relevance for this request (let alone the specific identity of the directors subject to this request) made clear that this was nothing more than a fishing expedition.

At the June 3 conference, the Court instead focused on Aetna's request for additional "financial oversight" custodians and directed Mednax to run test searches through the documents of these custodians, using the search terms Aetna has proposed.  According to the Court, "[t]he goal being that we can come back, and if Aetna's position is that the search of those 13 custodians revealed a number of important documents that had not previously been produced, we'll look a little more depth at the other groups, okay?"  *Id.* at 15:25-16:5.

## IV.   THE TEST SEARCHES OF THE FINANCE CUSTODIANS PRODUCED NO RELEVANT DOCUMENTS

Mednax performed test searches in accordance with the Court's instructions.  Running its own search terms and Aetna's requested search terms against the additional "financial oversight" custodians produced a total of 29,259 hits.  To determine whether or not such searches pulled

back any "important" documents,  Mednax reviewed a sample of 3,300.  Of that sample, 1,988 documents were marked non-responsive, meaning they were false hits that had nothing to do with the case.  1,211 of the documents were marked responsive, meaning they generally related to the finances of the practices groups, their acquisition, or changes regarding NICU coding or the BabySteps software.  However, none of the documents marked responsive indicated or otherwise related to Aetna's allegation that there were "pressures placed on the practice groups by Mednax corporate to meet financial (*i.e.*, billing) goals," or "complaints or discussions by employees within Mednax's physician groups about billing practices or financial incentive," or "improper billing practices."  Mot. at 2.  In other words, none of these documents supported Aetna's claims about why it needed these additional custodians.  Further, none were the sort of "important documents" that the Court indicated might warrant additional searching or the addition of custodians.

There is no reason why in the face of such results, Mednax should be required to add any of Aetna's requested custodians or search terms, let alone the dozens of custodians and terms that Aetna demands.  The test set out by the Court validates what Mednax has said all along:  that it has already selected the most relevant custodians who have the most responsive files to Aetna's allegations, and that those custodians' files, along with the extensive central repository searches that Mednax has undertaken, will provide Aetna will appropriate access to all relevant discovery in this case.  The negative results of these searches demonstrate that Aetna should not be permitted to keep fishing.

## V. DESPITE THE RESULTS OF MEDNAX'S SEARCHES, AETNA'S CURRENT MOTION CONTINUES TO DEMAND DOZENS OF ADDITIONAL CUSTODIANS, INCLUDING NEW CATEGORIES NEVER BEFORE REQUESTED

Mednax met and conferred with Aetna on June 27, at which time the parties discussed the results of Mednax's test searches.  During the meet and confer, the parties discussed a

compromise under which Mednax would narrow the searches Aetna has proposed in respect of the "financial oversight" custodians, in return for Aetna's agreement to accept those results and withdraw requests for further searches or custodians.

While Mednax was in the midst of conducting additional test searches to assess the feasibility of that compromise, and without seeking to confer with Mednax again, Aetna filed its Motion.  The Motion requests even more custodians than Aetna requested at the June 3 conference.

Specifically, while maintaining its demand that Mednax review the files of 13 additional financial oversight custodians, the Chief Compliance Officer, Medical Director custodians, and custodians from its Neonatal/Hospital-Based Coding Committee, Aetna now also demands that Mednax add to its custodian list some unspecified number of individuals who were "associated with the development of the BabySteps software."  Mot. at 3, n. 4.

<u>**ARGUMENT**</u>

Aetna's belated Motion for dozens of additional Mednax custodians, requested well after the May 1 document discovery deadline, should be denied because Aetna has not met its burden of proving that Mednax's current custodians are insufficient and that the requested additional custodians are likely to result in the production of unique, non-duplicative, relevant documents. Furthermore, the Court should deny Aetna's request that Mednax run Aetna's proposed search terms across the files of Mednax's custodians, as such terms are unreasonably broad and generic, produce tens of thousands of false hits, and would result in extraordinary and disproportionate discovery burdens on Mednax that would cause lengthy delays in the completion of discovery and trial.  Subject to the compromise Mednax proposes below, the Court should deny Aetna's Motion.

I.   **AETNA FAILS TO IDENTIFY ANY DEFICIENCY IN MEDNAX'S CUSTODIANS OR DEMONSTRATE THAT THE ADDITIONAL CUSTODIANS PROPOSED HAVE UNIQUE, NON-DUPLICATIVE, RELEVANT DOCUMENTS**

At the outset of discovery, Mednax undertook a careful effort to identify and search the documents of those custodians who were likely to have the most relevant information responsive to Aetna's claims.  Mednax's discovery efforts have been more than adequate, and the burden lies on Aetna to prove otherwise.  "Asking a court to compel a party to search the ESI of additional custodians is similar to asking a court to compel a party to undertake additional efforts to search for paper documents.  In either case, the requesting party is second-guessing the responding party's representation that it conducted a reasonable inquiry for responsive information, and in either case, the burden appropriately lies with the requesting party to show that the responding party's search was inadequate."  *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *3 (E.D. Pa. June 8, 2016).  To satisfy this burden, Aetna "must demonstrate that the additional requested custodians would provide unique relevant information not already obtained."  *Id.*  Aetna cannot point to any unique relevant documents that the requested custodians may have that have not already been adequately addressed by Mednax's current custodians and productions.[2]

---

[2] Aetna cites a handful of cases compelling the addition of custodians, but all are distinguishable.  *See e.g.*, *City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, 2015 U.S. Dist. LEXIS 110712, at *6 (D.N.J. Aug. 21, 2015) (compelling additional custodians only after plaintiffs provided "sufficient information . . . to support a fair inference that among the 22 to 45 additional custodians it seeks, there may be a number of custodians with emails or analyses different from those of the agreed custodians"); *Family Wireless #1, LLC v. Auto Techs., Inc.*, 2016 U.S. Dist. LEXIS 65885, at *8 (D. Conn. May 19, 2016) (compelling the addition of only three custodians).

### A.      *Individuals Who Oversee Mednax's Financial Performance*

Aetna's Motion requests that the Court compel Mednax to search the files of thirteen custodians that oversee Mednax's financial performance.   Mednax previously tested Aetna's search terms on the financial oversight custodians and reviewed a sample of those documents. Not a single document contained any reference to any pressure to upcode, fraudulent coding by Mednax's software, or any other topic relevant to Aetna's claims.   Aetna thus cannot establish that the financial oversight custodians have any unique and relevant documents that have not already been produced.

Despite the irrelevance of these custodians, Mednax has already added as custodians Messrs. Pepia and Clemens—two of Mednax's most senior executives in the financial space—in response to the Court's prior instruction that Mednax add "significant [financial] decision-makers" to its custodian list.   Under the compromise Mednax has offered, it is also prepared to produce responsive documents from 8 other custodians that Aetna requests, which is more than sufficient to satisfy Aetna's demands.

### B.      *Mednax's Chief Compliance Officer*

Aetna argues that Mednax's Chief Compliance Officer should be added as a custodian because she would have been included on "communications about improper Mednax billing practices."  Mot. at 2.   But Mednax has reviewed its compliance records and come across no evidence of complaints about billing practices.   Furthermore, Mednax's Chief Compliance Officer is Mary Ann E. Moore, who is also Mednax's Chief Legal Officer.   Accordingly most, if not all of her documents, to the extent they contain any of Aetna's broad search terms, will be privileged.   There is thus no reason for Aetna to demand that Mednax search the files of Ms. Moore, which will not contain evidence of complaints about billing and coding practices, or any other non-privileged, non-duplicative documents of relevance.   Consistent with the parties'

discussions with the Court at the June 3 conference and the Court's request that the parties focus on the "financial oversight" custodians, the Court should reject this request.

### C.    *Mednax's Medical Directors*

Aetna speculates that practice group Medical Directors should be added as custodians because if "complaints or discussions by employees within Mednax's physician groups about billing practices or financial incentives" took place, then such communications "would necessarily be elevated to its Medical Directors."  Mot. at 2.  Such speculation appears to be based entirely on the deposition testimony of one of Aetna's witnesses—Dr. Yoss—who indicated, in response to a hypothetical question from Aetna, that if he had complaints about Mednax's billing practices, he would report them to the practice group's Medical Director.  *See id.* at 6-7 & n.9.  Based on this testimony and its speculation that the files of Mednax's current and former Medical Directors will contain information about billing complaints, Aetna asks that it be allowed to identify 20 random current and former Medical Directors through the files of which it will put Mednax to the burden and expense of looking for billing complaints.

There is absolutely no basis for this request and no reason to speculate.  If the Medical Directors ever received such complaints, they were required under Mednax's compliance guidelines to report them through Mednax's internal compliance reporting channels.  But as Mednax has previously advised Aetna, it has searched its records, and there are no records concerning billing complaints relating to the allegations in this case.  *See* Ex. 3, Mednax's Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, at No. 5.  Accordingly, there is no basis to require Mednax to undertake speculative and burdensome searches of the files of its Medical Directors for complaints that do not exist.  In any event, Mednax has already agreed to produce such complaints if it comes across them during the course of its review of custodial files and central repositories.

Aetna's request for more custodians on this topic is nothing more than a fishing expedition. This is made clear by the fact that, despite having started its investigation in or around 2010, having interviewed potentially dozens of Mednax personnel, and having had access to the voluminous discovery Mednax has produced in this case (including hundreds of thousands of Email Loop communications), Aetna's Motion remarkably fails to identify a single Medical Director that it wishes to add as a custodian. The reality is that Mednax's discovery to date is exposing Aetna's core fraud theories as a lie, and thus Aetna is desperately scrambling to impose new and burdensome demands on Mednax so that it can fish for any evidence to support its bogus claims. This is improper and should be denied.

**D.**   ***Coding Committee Members***

Aetna has also moved for the Court to compel Mednax to search the files of "individuals with business roles who serve on its software coding committee." Mot. at 1. While Mednax does not have a "software coding committee," Mednax assumes the committee to which Aetna refers is Mednax's Neonatal/Hospital-Based Coding Committee, which is responsible for preparing the coding guidelines, which have historically served as the blueprint for the BabySteps software, preparing educational and training materials, and overseeing the work of Mednax's Coding Educators who educate neonatologists and other medical personnel on proper and compliant coding practices. The Neonatal/Hospital-Based Coding Committee is led by Dr. Kanter and Ms. O'Hara, both of whom have already been identified as Mednax custodians. Mednax has also identified three other custodians who serve on the Neonatal/Hospital-Based Coding Committee (Christine Lewandowski, Jennifer Granberry, and Michael Stanley). Aetna has not explained why Mednax should undertake the burden of adding 19 additional current and former committee members as custodians, especially when they are less senior and less knowledgeable than the five whom Mednax has already identified, and will not have unique

information that will not already be captured by the five committee members whose documents Mednax has agreed to produce.

Moreover, Mednax is producing far more than the custodial files of these five committee members. It has also agreed to produce the central files of the Neonatal/Hospital-Based Coding Committee, which will give Aetna access to the development and application of Mednax's coding guidelines, and meeting minutes where such guidelines and Mednax's coding policies and procedures were discussed. Mednax also is making a robust production of educational and training materials prepared by the Neonatal/Hospital-Based Coding Committee, which will give Aetna access to relevant discovery into how Mednax trained its coders and physicians with respect to compliant billing practices. On top of these materials, Mednax is also producing the files of the Medical Coding Department, including the Email Loop and coding audit materials. Aetna does not attempt to articulate how additional committee members would have unique relevant documents not captured by Mednax's current document productions.

### E. *Individuals Who Developed BabySteps Software*

Aetna requests that Mednax add as custodians all individuals "associated with" the development of the BabySteps software. Mot. at 3. The Court already has considered and rejected this exact request. At the June 3 conference, Aetna argued that Mednax should supplement its responses to Aetna Interrogatory No. 6, which broadly requested that Mednax "[i]dentify all individuals associated with the development of Your electronic medical records system, such as current or former employees, contractors, software developers, and medical personnel on BabySteps." Ex. 3, Mednax's Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, at No. 6; Ex. 1, Transcript of June 3, 2019 Conference, at 32:12-17. The Court rejected Aetna's demands and instead instructed Mednax to identify "who was ultimately responsible for the actual code itself." *Id.* at 37:3-12.

Mednax then undertook reasonable inquiries to make that determination.  As it advised Aetna on June 28, "given that the BabySteps software was developed, and the original source code was written, more than fifteen (15) years ago, MEDNAX is unable to identify the specific individual(s) who wrote the source code for BabySteps. Subject to the foregoing, Robert C. Bryant, Mednax's former Senior Vice President and Chief Information Officer, was involved in the development and implementation of BabySteps, and can testify to its development, implementation, and operation during all time periods relevant to this litigation."  Ex. 3, Mednax's Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, at No. 6.  As Mednax informed the Court during the June 3 conference, custodian Darren Handler, the Director of Data Warehousing, "was involved in the development of Baby Steps" and "knows this background very well."  Ex. 1, Transcript of June 3 Conference, at 35:14-18.  The files of custodians Handler and Bryant are more than sufficient.

Further, Mednax is already producing a plethora of documents regarding the development and operation of BabySteps, including every version of the coding algorithm that serves as the "Decision Tree" for BabySteps.  With these Decision Trees, Aetna can trace how BabySteps reaches every coding suggestion based on inputs from physicians.  Because Aetna cannot validly argue that Mednax's custodians are insufficient, or that Mednax has not supplied additional relevant and responsive information from its central files, Aetna's Motion should be denied.[3]

---

[3] To the extent Aetna desires more documents relating to BabySteps, Aetna's request is premature, as this Court has not yet determined whether such documents are relevant and properly within the scope of discovery, particularly considering the highly proprietary nature of BabySteps. Ex. 1, Transcript of June 3, 2019 Conference, at 38:2-4 ("I have not decided yet that discovery concerning source code is relevant or not disproportional.").  Mednax incorporates its Opposition to Aetna's Motion to Compel Access and Production of Information Relating to BabySteps Software.  Dkt. 92.  Documents related to BabySteps are irrelevant to Aetna's claims

## II.     AETNA'S OVERBROAD, GENERIC AND DUPLICATIVE SEARCH TERMS SHOULD BE REJECTED

In addition to requesting dozens of additional document custodians be added to Mednax's search universe, Aetna also asks this Court to order Mednax to run search terms that are disproportionate to the needs of this case.  This exceeds what Fed. R. Civ. P. 26 allows, which is only "discovery regarding any nonprivileged matter that is relevant to [Aetna's] claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Mednax has already proposed and run terms that are fully responsive to Aetna's allegations in its Complaint.

Mednax has proposed running the following search terms against the files of the custodians it has proposed:

- Searches relating to upcoding, overbilling and unnecessary medical services:

    o   (NICU OR neo*) /15 upcod*;

    o   (NICU OR neo*) /15 miscod*;

    o   (NICU OR neo*) /15 (unnecessary w/3 (procedure OR test)); or

    o   (NICU OR neo*) /15 overbill*;

- Searches relating to Mednax's Coding Committee:

    o   (NICU OR neo*) AND (Coding /1 Comm*)"

- Searches relating to coding guidelines:

    o   (NICU OR neo*) /15 (coding/15 guideline*);

- Search relating to Baby Steps software, including its "decision tree" and "algorithm":

    o    "Babysteps AND ("decision tree" OR algorithm)

- Searches relating to coding education and training:

---

as articulated in the Complaint and are highly proprietary.  Until the Court decides this pending issue, this aspect of Aetna's present Motion is premature.

- o   (NICU OR neo*) /15 (coding /15 educat*);

- o   (NICU OR neo*) /15 (coding /15 train*);

- Search relating to audits of Mednax's coding practices:

- o   (NICU OR neo*) /15 (coding /15 audit*)

- Searches relating to complaints or disputes about Mednax's coding or billing:

- o   (NICU OR neo*) /15 ((billing OR coding) /15 (complaint OR dispute))

These searches, along with the repositories searched by Mednax, respond to each of the "four topics central to" Aetna's claims.  *See* Mot. at 2 (the four topics are:  (i) "financial oversight and evaluation of Mednax's practices;" (ii) "complaints or discussions by employees within Mednax's physician groups about billing practices or financial incentives"; (iii) "communications about improper Mednax billing practices" and (iv) "documents and communications relating to the development and modifications" to BabySteps software).

     Nevertheless, Aetna has requested that  Mednax run the following additional searches targeted to capturing irrelevant communications concerning the acquisition and financial performance of the practice groups:

- (NICU OR neo*) AND (Group NEAR(20) negotiate OR agree* OR contract OR join OR purchase OR buy OR recruit OR target OR ident* OR profit* OR reven* OR (pro NEAR(3) form*))

- (NICU OR neo*) AND ((perform* OR audit* OR (month* NEAR(2) report)) NEAR(20) billing OR financ* OR result* OR improv* OR increas* OR decreas* OR punish OR expect* OR edit*)

Mot. at 7.

     The documents sought by these terms, standing alone, do not have any relevance to this case.  Aetna alleges fraud in the upoding of medical bills, arising from the alleged corporate pressure to upcode, and not fraud in connection with the acquisition of practice groups.  Routine discussions the custodians may have had about the general financial performance of the practice

groups and/or the acquisition of practice groups is not relevant to Aetna's claims in this case. Furthermore, when Mednax tested these terms against a prior group of custodians Aetna previously proposed (significantly smaller than its current proposal of dozens of custodians), they pulled back over 100,000 documents.  While Aetna argues that reviewing over 100,000 documents is not significantly burdensome, Mot. at 13, Aetna ignores the fact that Mednax has *already* reviewed 494,680 documents and produced 415,843 documents totaling 958,869 pages. Reviewing an *additional* 100,000 documents on top of this already extensive review and production is not proportionate to the needs of this case.  "Although [Mednax] is a large corporation with substantial resources, the Court should not be … insensitive to the[] costs" of doing a significant additional review and production.  *Sterling Heights*, 2015 U.S. Dist. LEXIS 110712, at *9.  And Aetna's search terms are particularly disproportionate to the needs of this case given that they contain such generic terms as "negotiate," "agree," "contract," "join," "purchase" "buy" "target" "recruit" "profit" and "revenue."  Further, to the extent such topics have any relevance, they are more properly addressed through repository productions and existing custodians.

Similarly, the Court should also reject Aetna's demand that Mednax run additional searches Aetna has proposed relating to coding and billing:

- (NICU OR neo*) AND ((billing OR coding OR software) NEAR(20) complain* OR comment OR issue OR problem OR disagree OR improper OR alter* OR amend*)

These searches simply duplicate searches that Mednax is already running with a variety of generic terms that will inevitably produce thousands upon thousands of false hit.  Initially testing on this terms, across the same smaller group of custodians than what Aetna demands now, indicates that this string pulls back over 44,000 documents.  It should also be rejected.

### III.   MEDNAX PROPOSES A COMPROMISE

Notwithstanding the irrelevance of and undue burden imposed by Aetna's proposed custodians and search terms, Mednax is willing for the sake of compromise to propose the following, if Aetna will withdraw the balance of its custodian and search term demands: Mednax will add 8 "financial oversight" custodians to its custodian list[4] and will review the files of those custodians using both (a) the search strings Mednax has proposed and (b) a modified set of Aetna search terms, with some of the generic search terms removed, as set forth below:

- (NICU OR neo*) AND ((billing OR coding OR software) w/20 complain* OR comment OR issue OR problem OR disagree OR improper OR alter* OR amend*)

- (NICU OR neo*) AND (((billing OR coding OR software) w/20 (alter* OR amend* OR comment OR complain* OR disagree OR improper OR issue OR problem)) OR (((perform* OR audit* OR (month* w/2 report)) w/20 (billing OR decreas* OR edit* OR increas* OR punish))) OR ((Group w/20 ((pro w/3 form*) OR buy OR join OR negotiate OR profit* OR purchase OR recruit OR target))))

Mednax believes this proposal to add 8 custodians is more than reasonable and is consistent with the Court's prior indicated preference that the files of the "financial oversight" custodians be searched.  *See Sterling Heights*, Dist. LEXIS 110712, at *9 (denying motion to compel 45 custodians and compelling instead the addition of 10, where the proposed custodians were likely to have only "information duplicative of that in other agreed custodians' accounts").  In light of such compromise proposal, Mednax respectfully requests that the Court deny Aetna's request for the remaining custodians and search terms.  Mednax's proposed review of these documents would be on top of the hundreds of thousands of documents Mednax has already reviewed and

---

[4] Mednax is willing to add as custodians:  Bill Cox, Eric Kurzweil, David Clark, Gary Twiggs, Alan Oliver, Arnold Poole, Lee Wood, and Roger Hinson.

produced.  Mednax's compromise more than satisfies any need Aetna could have for additional custodians and search terms.

<u>CONCLUSION</u>

For the foregoing reasons, Mednax respectfully requests that the Court deny Aetna's Motion to Compel and enter an order approving Mednax's proposed compromise.

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Dated: July 31, 2019          BY:    */s/ Jennifer J. Barrett*

Michael B. Carlinsky*
Jennifer J. Barrett*
Luke Nikas*
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Ph: (212) 849-7000
Email: michaelcarlinksy@quinnemanuel.com
        jenniferbarrett@quinnemanuel.com
        lukenikas@quinnemanuel.com

LASH & GOLDBERG LLP
Martin B. Goldberg*
Lorelei J. Van Wey*
Jonathan E. Feuer*
100 Southeast 2nd Street
Miami, FL 33131
Ph: (305) 347-4040
Email: mgoldberg@lashgoldberg.com
        lvanwey@lashgoldberg.com
        jfeuer@lashgoldberg.com

 * Admitted Pro Hac Vice

CONRAD O'BRIEN PC
Howard M. Klein (No. 33632)
Robert N. Feltoon (No. 58197)
Andrew K. Garden (No. 314708)
Centre Square West Tower
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Ph: (215) 864-9600
Fax: (215) 864-9620
Email: hklein@conradobrien.com
        rfeltoon@conradobrien.com
        agarden@conradobrien.com

*Attorneys for Defendants Mednax, Inc., Pediatrix
  Medical Group, Inc., and Mednax Services, Inc.*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served upon all counsel of record via the Court's Electronic Filing System.

July 31, 2019                                    _/s/ Jennifer J. Barrett_____
                                                Jennifer J. Barrett