# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **AETNA, INC.,** *et al.*, | : | |
| **Plaintiff,** | : | **Civil action** |
| | : | |
| **v.** | : | **No. 18-2217** |
| | : | |
| **MEDNAX, INC.,** *et al.*, | : | |
| **Defendants.** | : | |
| | : | |

### AETNA'S MEMORANDUM OF LAW IN SUPPORT OF ITS
### MOTION FOR SPOLIATION SANCTIONS AND A SPOLIATION HEARING

Aetna[1] respectfully moves this Court to impose sanctions upon Mednax for its spoliation of evidence and to hold an evidentiary hearing on the issue.[2]

### PRELIMINARY STATEMENT

On a daily basis for more than three years after Mednax was on notice of Aetna's claim in this case, Mednax automatically and permanently deleted what likely amounts to hundreds of thousands of email records. The cause of the email destruction is not in dispute: Mednax maintains a 90-day email retention/deletion policy that can only be suspended if Mednax's internal legal department installs litigation holds. Mednax failed to place such holds on the accounts of key personnel *for years* after it was placed on notice of Aetna's fraud allegations. Absent a legal hold, Mednax concedes that electronic communications and files "drop off" and are gone forever.

---

[1]  Aetna Inc., Aetna Health, Inc., Aetna Health Management, LLC and Aetna Life Insurance Company.

[2]  On February 28, 2020, Aetna's counsel alerted the Court that it would be filing for sanctions for spoliation of evidence. The court directed that such a motion be directed to it, and not to the Court-appointed Discovery Master.

Specifically, Aetna alerted Mednax to its fraud allegations in January 2015 and Mednax reported Aetna's claims to the Mednax Board of Directors the next month.  As the Court is aware, the parties then engaged in years of settlement discussions, which included in-person meetings and presentations through which Aetna articulated in significant detail the basis of its fraud allegations.  Despite hiring an army of high-profile lawyers—including numerous attorneys from Boies Schiller, Quinn Emmanuel, and Lash Goldberg—Mednax failed to install a single litigation hold between January 2015 and June 22, 2018, although it knew, during that time period, that Aetna was accusing it of a wide-spread fraudulent billing scheme.  For that entire three-and-a-half year period, Mednax's auto-deletion function chewed through and destroyed likely thousands of emails on a daily basis.  Because they were destroyed, the email records were not available for Mednax to collect, review, and produce in response to Aetna's discovery requests or Court orders defining the scope of what items Mednax was required to produce in this matter.

Mednax offers a singular excuse for its reckless or intentional inaction:  the issue of installing litigation holds supposedly "slipped through the cracks."   This is an astonishing contention given that Mednax, a publicly traded company and the largest supplier of neonatal services in the country, has numerous in-house attorneys and hired multiple law firms to defend it in 2016.  Moreover, that excuse was proffered only after Mednax replaced its lead counsel in the fall/winter of 2019, and new lead counsel conducted an "investigation" into the reasons why Mednax failed to preserve records.  While Mednax contends all records relating to this investigation are privileged, it permitted a former employee—who was being paid $500/hour and who did not participate in the "investigation"—to testify as to the self-serving conclusion reached at the end of this purported investigation.  Given Mednax's refusal to produce any

evidence to support this conclusion, it should not be credited. But even if the years-long failure to impose litigation holds just "slipped through the cracks," that does not inoculate Mednax from a finding that it destroyed evidence recklessly and in bad faith.

Mednax's failure to preserve evidence for years plainly supports the imposition of spoliation sanctions.  Each element necessary to impose such sanctions is present:  the records were in Mednax's possession; Mednax was aware of Aetna's claims; Mednax's email deletion policies led to the systemic destruction of critical evidence over the course of nearly five (5) years; and Mednax was reckless and acted in bad faith in allowing this to happen on a daily basis.  Aetna, therefore, requests the imposition of, at a minimum, an adverse inference in Aetna's favor, following an evidentiary hearing held by this Court, at which Aetna will detail the vast scope of the destruction and the lack of credibility in Mednax's proffered excuse.

## **FACTUAL BACKGROUND**

The relevant factual background involves three primary and interrelated issues:

*First*, Aetna brought its allegations to Mednax's attention in January 2015.  In response, Mednax conveyed those allegations to its Board of Directors in February 2015. The parties entered into a tolling agreement and a long period of settlement negotiations, which included several in-person meetings and which concluded in November 2017.  As Mednax concedes, throughout this entire time period, Mednax and its counsel were on notice of, and anticipated, the instant litigation with Aetna. Indeed, Mednax has asserted attorney work product privilege – which can only be invoked "in anticipation of litigation" – over portions of what little material it has preserved from this time period.

***Second***, despite anticipating the instant dispute, Mednax and its counsel failed to implement any litigation holds on any employee relating to this dispute until June 2018—***three and a half years*** later.

***Third***, the failure to install litigation holds has had a devastating impact on the availability of Mednax to collect and review documents because Mednax maintains—and has maintained for the entire time period in dispute—a 90-day e-mail destruction policy.  Pursuant to this policy, e-mails (and corresponding attachments) are automatically deleted and "gone forever" if not manually saved within the 90-day period.  Mednax maintains absolutely ***no*** backup system.  The auto-deletion feature can only be suspended if Mednax's legal department implements a litigation hold.  Because no hold was installed until ***years*** after Mednax anticipated this litigation, the auto-deletion feature of Mednax's policy remained on and deleted an unknowable, but certainly massive, number of electronic records from 2015 through December 2019.

### A.   MEDNAX WAS AWARE OF, AND ANTICIPATED, THIS LITIGATION AS EARLY AS JANUARY 2015.

In January 2015, Aetna informed Mednax that Aetna contended Mednax had been engaged in improper and fraudulent billing practices.  (*See* D.E. 130-1 at Pierce Decl. ¶ 6 (hereinafter "Pierce Decl."); Ex. 1 Moore Dep. at 24).  On February 5, 2015, Mary Anne Moore, Mednax's Chief Legal Counsel, who doubled as Mednax's Chief Compliance Officer, brought Aetna's allegations to the attention of the Mednax Board of Directors.  (*See* Ex. 1 Moore Dep. at 84-85; *see also* Ex. 2, Mednax Privilege Log ("Log") at Entry 21.)  In October 2015, Aetna provided Mednax with a draft statement of its fraud claims.  (D.E. 130-1 at Pierce Decl. at ¶¶ 8-9.)  Ms. Moore discussed the allegations with Mednax's CFO and COO on November 2, 2015

and again alerted the Mednax Board of Directors on November 11, 2015.  (*See* Ex. 1, Moore

Dep. at 87-89; Ex. 2, Log at Entries 22, 185.)

Despite being on notice of Aetna's allegations, Mednax did not install any litigation holds

in 2015, and Mednax's 90-day email destruction policy continued to actively and permanently

delete electronic communications and files.  (Ex. 1, Moore Dep. at 86-87; Ex. 3 Courcelle Dep.

at 56-57; Ex. 4, 1/31/20 Letter and Litigation Hold Chart (identifying earliest holds as occurring

on June 22, 2018).)  In fact, Mednax is withholding documents from November 2015 on work

product grounds.  (Ex. 5, Hawkins Dep. at 45 (identifying document withheld because it was

"prepared at the direction of Mary Anne Moore in anticipation of instant litigation"); Ex. 2 Log

at 7 (identifying November 10, 2015 e-mail exchange).)  For example, Mednax is withholding a

November 5, 2015 email and attachment sent by Mary Ann Moore to other Mednax personnel

which "reflect[s] the thoughts and mental impressions of counsel regarding Aetna's allegations

and prepared by or at the direction of counsel **in anticipation of the instant litigation.**"  *See* Ex.

2, Supp. Priv. Log. Vol. 5 at Entry 190 (emphasis added).  Mednax thus concedes that at that

time, it "anticipat[ed] . . . the instant litigation" – and therefore cannot deny it had an obligation

to preserve evidence related to Aetna's claims.

On January 15, 2016, the parties met in person in Hartford, Connecticut, to discuss

Aetna's allegations.  (Pierce Decl. at ¶¶ 8-9.)  At that meeting, Aetna made a detailed

presentation to Mednax, providing a thorough overview of its analysis and anticipated legal

claims. (*See id.* at Ex. 1.)  The analysis, as set forth in Aetna's 63-page presentation to Mednax,

centered on a multivariate linear regression of Mednax and non-Mednax claims data, in order to

determine the difference in the cost of NICU services for a given episode of care between

Mednax and non-Mednax NICU practices.  (*Id.* at ¶ 6.)  The regression analysis was designed to

control for—and thus factor out—a host of different variables that could otherwise account for a difference in the cost of care between Mednax and non-Mednax practices.  (*Id.* at ¶¶ 8, 11-25.) Mednax was told that the analysis reflected upcoding of claims occurring with numerous neonatology practices owned by Mednax throughout the country.

On February 4, 2016, almost immediately following Aetna's January 15 presentation, Mednax signed a tolling agreement with Aetna specifically because Aetna was threatening litigation.  (*Id.* at ¶ 10; *see also* Moore Dep. at 94-95.)  The parties met several additional times in 2016 on issues pertaining to Aetna's allegations and the underlying data/analysis.  (*Id.* at ¶¶10-16.)  Despite viewing Aetna's presentation, entering a tolling agreement, retaining multiple outside law firms, and conferring multiple times with Aetna to receive data, Mednax did not install any litigation holds in 2016, and Mednax's 90 day email destruction policy continued to actively and permanently delete electronic communications and files throughout the company. (Ex. 1, Moore Dep. at 86-87; Ex. 3 Courcelle Dep. at 56-57; Ex. 4, 1/31/20 letter and Litigation Hold Chart; Ex. 6, 2/12/20 letter and Litigation Hold Chart; *see infra* note 3 (log showing retention of outside counsel in 2016); *see also* Ex. 5 Hawkins Dep. at 27-28 (in-house counsel testifying that he learned of the dispute in February or March 2016 via a meeting with "management team at Mednax.").

On January 19, 2017, Aetna and Mednax met again, and Mednax presented its response to Aetna's analysis. This time, Mednax was represented by a large number of outside attorneys, including David Boies of Boies Schiller Flexner LLP and Martin Goldberg of Lash Goldberg.[3]

---

[3] Mr. Goldberg still represents Mednax in connection with this dispute, and has since at least early 2016.  (*See* Ex. 2, Log at 192.)  Mr. Boies was also retained in 2016.  (*Id.* at 216.)  Mr. Boies represented Mednax until at least October 2017.  (*See* Ex. 5, Hawkins Dep. at 50 (noting that Quinn Emmanuel was hired in "late fall" 2017; *see also id.* (noting that attorney Luke Nikas had moved from Boies Schiller to Quinn Emmanuel).  Several of Mr. Boies' colleagues also

(Pierce Decl. at ¶ 17; *see also* Ex. 5, Hawkins Dep. at 38 (testifying that Mr. Boies was a "very prominent" attorney).) The parties discussed Aetna's claims and Mednax offered its purported defenses to those claims. (Pierce Decl. at ¶ 17). After receiving Mednax's comments, Aetna's expert consultants further refined the regression analysis to address Mednax's comments. On March 27, 2017, the parties re-convened in New York, and Aetna presented its reply. (*Id*. at ¶ 18 & Ex. 7.) In this presentation, Aetna addressed each of the arguments raised by Mednax, and either refuted Mednax's argument or explained how Aetna modified the analysis to address Mednax's critique. After addressing each Mednax issue, and modifying its analysis to address certain of them (even though Aetna did not agree with the criticisms), Aetna provided Mednax with its updated analysis. (*Id*. at ¶ 19-20.) In May 2017, Aetna provided Mednax with further refinements. (*Id*.)

In October 2017, Mednax terminated the tolling agreement with Aetna. On November 10, 2017, Aetna filed a writ of summons in Pennsylvania state court, which was served on Mednax in December 2017. The Writ of Summons named as defendants not just Mednax, but also dozens of physician practice groups owned by Mednax throughout the country. (*See* D.E. 1-1, Writ of Summons; Ex. 1, Moore Dep. at 99-101.) Despite meeting with Aetna in 2017 (with two law firms representing Mednax at the time) and despite being served with a writ in 2017, Mednax failed to implement any litigation holds in 2017, and Mednax's 90-day email destruction policy continued to actively and permanently delete electronic communications and files throughout the company. (*See* Ex. 1, Moore Dep. at 101; Ex. 4 and 6, 1/31/20 and 2/12/20 letters with Litigation Hold Charts.)

---

worked on the matter for Mednax, including partners Nick Gravante, Jim Fox Miller, and Luke Nikas, together with other "associate attorneys." (Ex. 5, Hawkins Dep. at 38.) To state the obvious, Mednax had hired an army of lawyers in connection with Aetna's allegations.

Aetna filed its Complaint in this case on April 25, 2018.  At this time, Mednax was represented by the Quinn Emmanuel and Lash Goldberg law firms.  Two (2) months later, on June 22, 2018, Mednax finally implemented its first litigation holds for this case, but for just *10 individuals*.  (*See* Ex. 4 and 6, 1/31/20 and 2/12/20 letters with Litigation Hold Charts; Ex. 5, Hawkins Dep. at 47 (testifying as corporate representative that no legal holds were instituted relating to the instant dispute prior to June 22, 2018).) These litigation holds coincided with the parties Rule 26(f) conference in early July, and overlap substantially with Mednax's Rule 26(a) disclosures produced in July 2018.  These meager number of litigation holds were implemented three and a half years after Mednax was first informed of Aetna's allegations, and two and a half years after the parties first met on January 15, 2016 to review evidence supporting Aetna's allegations.

### B.   AFTER RETAINING NEW LEAD COUNSEL, MEDNAX IMPLEMENTS DOZENS OF NEW LITIGATION HOLDS IN DECEMBER 2019—2 YEARS AFTER AETNA INITIATED LITIGATION AND NEARLY FIVE YEARS AFTER MEDNAX WAS FIRST AWARE OF AETNA'S ALLEGATIONS.

In late 2018 and into 2019, the parties were engaged in several discovery disputes.  Aetna was seeking documents from Mednax employees responsible for building and overseeing Mednax's internal billing/coding system, BabySteps.  (*See* Ex. 7, 12/10/18 letter; Ex. 8, 2/19/19 letter.)  Aetna was also seeking documents held by Mednax employees responsible for overseeing the financial performance of the various Mednax physician practice groups.  (*See Id.*) Aetna moved to compel the production of these documents, which would have required Mednax to identify numerous custodians who would potentially possess relevant and responsive documents.  (*See* D.E. 87 (motion relating to BabySteps records and custodians); D.E. 113 (motion relating to Mednax custodians).)

Aetna was also seeking in discovery email communications to and from Mednax physicians, who were employed by Mednax across the country.  Mednax's counsel at the time, however, informed Aetna during November and December 2018 that Mednax did not retain such records on Mednax servers.  (Ex. 9, 11/21/18 email from A. Kumer; Ex. 10, 11/30/18 email from L. Nikas)  During later depositions, however, Aetna learned that this representation was false. Mednax has, at all relevant times, maintained e-mails with its physicians on Mednax servers. (Ex. 3, Courcelle Dep. at 30-31.)  Mednax went so far as to insist that Aetna had to issue subpoenas to its physician practices to obtain records from those practice groups, D.E. 76-3 at p.3 of 107, before being directed by this Court to identify the groups for which it would not agree to produce documents, D.E. 62 at ¶4b.  Mednax then reversed course and indicated it would not decline to produce discovery on behalf of any of its neonatal practice groups, (Ex. 11, 3/18/19 Email from J. Chun (attachments omitted)), although it continued to insist that individual physicians, including practice managers, should not be treated as custodians in this matter (D.E. 126).  While Mednax counsel was misleading Aetna about who controlled these electronic communications, and expending time litigating the issue, Mednax's 90 day email destruction policy continued to actively and permanently delete the evidence Aetna was seeking to acquire. In the end, Mednax's assertion of control over the productions of its practice groups allowed it to continue to conceal this destruction and allow the destruction to run unabated while it continued to litigate which individuals should be designated as custodians.

Mednax obviously knew that if Aetna's motions were granted, Mednax would need to identify the relevant custodians, capture available records (including e-mails), and search for responsive records.  While these disputes remained unresolved, however, Mednax still did not timely install appropriate litigation holds on the potential witnesses/custodians implicated by

Aetna in its pursuit of relevant records.  On March 14, 2019, Mednax implemented litigation

holds for just 15 custodians who had financial oversight over its physician practices.  But

Mednax still did not impose litigation holds for custodians involved with the BabySteps software

beyond the individuals who received litigation holds in June 2018, or for the physicians from

whom Aetna had long been seeking documents/e-mail records, even though it simultaneously

informed Aetna that it would be producing records on behalf of those practice groups.  (*See* Ex.

11, 3/18/19 Email from J. Chun; Ex. 4 and 6 at Litigation Hold Charts.)

  The Court granted Aetna's motions on November 8, 2019 and December 2, 2019 (*See*

D.E. 163 (addressing BabySteps motion) & 174 (addressing additional custodians, including

financial custodians).)  It was only after these motions were granted that Mednax installed a

broader set of litigation holds and searched for records and e-mails responsive to the Court

Orders – including on its practice groups' Medical Directors, financial custodians and BabySteps

custodians.  (Ex. 4 and 6 at Litigation Hold Charts).  Mednax implemented these litigation holds

on December 9, 2019 and December 19, 2019.  *Id.*  Prior to that time, Mednax's 90 day email

destruction policy continued to cause electronic communications and files to be permanently

deleted.  A handful of additional litigation holds were then implemented on December 19, 2019,

January 31, 2020, and February 20, 2020. (Ex. 12, 3/13/20 letter and Litigation Hold Chart; Ex.

13, 4/8/20 letter and Litigation Hold Chart).

  By December of 2019 Mednax had fired the Quinn Emmanuel firm as its lead counsel.

Aetna believes that the broader litigation holds imposed thereafter were prompted by new and

current lead counsel, Robbins Russell, after Robbins Russell learned that Mednax and its prior

counsel (and current counsel from Lash Goldberg) failed to ensure that appropriate litigation

holds were in place much earlier.  In fact, it was at this same time (December 2019) that Mednax

informed Aetna *for the first time* that Mednax maintained a 90-day email destruction policy which rendered huge volumes of records unavailable for review.  *See infra* Section II.C.  It was not until Robbins Russell became involved in the case, and the Court entered discovery Orders favorable to Aetna, that Mednax finally came clean on the fact that the auto-deletion policy had been eliminating electronic communications and files for nearly five (5) years—no one from Mednax, the Boies Schiller firm, the Quinn Emmanuel firm, or the Lash Goldberg firm disclosed anything of the kind to Aetna prior to December 2019.

###### C.    BECAUSE MEDNAX PERMANENTLY DELETES E-MAILS AFTER 90 DAYS, THE FAILURE TO IMPLEMENT LITIGATION HOLDS RESULTED IN WIDESPREAD AND SYSTEMATIC DESTRUCTION OF ELECTRONIC RECORDS.

Under the terms of Mednax's e-mail retention/deletion policy, Mednax automatically and permanently deletes email records after 90-days *unless* they are specifically and manually saved by the Mednax employee.  (*See* Ex. 14, E-mail Retention Policy at 1 ("It is the Policy of the Company to manage E-Mails on a rolling 90-day schedule unless such E-Mails have been classified as Records in accordance with the Records Management Policy"); *see also* Ex. 3, Courcelle Dep. at 39-42.)  Mednax also has no backup system, so if an e-mail or its attachment is deleted, it cannot be recovered.  As Mednax's Director of Litigation explained, absent a litigation hold, e-mails "*drop off*" after 90 days, meaning that the e-mails will be "gone forever."  (Ex. 3, Courcelle Dep. at 42 (emphasis added).)

Mednax's auto-deletion policy has been in existence for the entire time period at issue in this dispute.  (*Id.*; Ex. 4, 1/31/20 letter)  During this time period, Mednax used two different e-mail systems—First Class and Office 365—but the policy applied equally to both systems.[4]  (*See*

---

[4] The only difference between the two e-mail systems used by Mednax is that with the First Class system, when a litigation hold was installed, the employee's then-existing e-mails would be placed onto a backup tape.  (Ex. 3, Courcelle Dep. at 33-35; *see also* Ex. 15, 5/29/20

Ex. 3, Courcelle Dep. at 30-33, 42.) This auto-delete function can only be suspended if Mednax

imposes a litigation hold, which Mednax failed to install in this case until years after Mednax

was aware of Aetna's allegations.  As a result, from January 2015 to June 22, 2018, the auto-

deletion aspect of Mednax's e-mail retention policy remained "on" and Mednax email records

continued to "drop[] off."[5]

       There is abundant evidence of record establishing the devastating impact of the auto-

deletion policy on the availability of documents to review.  (*See* Ex. 16, 6/9/20 letter and

Litigation Hold Chart.)   The levels of emails residing on relevant custodians accounts prior to

imposition of litigation holds, compared to the amount of emails residing on those accounts after,

reflects the huge volume of electronic communications permanently deleted.  For example, Ms.

Laurie Klink manages Mednax's Medical Coding Department, has worked at Mednax for 20

years, and is an important witness in this case.  Indeed, one of her former colleagues testified that

Ms. Klink pressured Mednax coders to find ways to bill more intensive and more expensive

codes than necessary.  (Ex. 17, Cassano Dep. at 54:18-56:5.)   Ms. Klink was among the first ten

Mednax employees to receive a litigation hold on June 22, 2018.  Mednax was only able to

collect approximately 11,625 e-mails predating the litigation hold, despite the fact that Ms. Klink

---

letter.) With Office 365, this function occurs within Office 365 and does not require backup
tapes.  (*Id.* at 19.)  To be clear, however, backup tapes were not used for every employee under
the First Class system—only when an employee was placed onto a litigation hold would Mednax
create a backup tape for that particular hold.  (*Id.* at 33-36; *see* Ex. 15, 5/29/20 letter.)

    [5] If a Mednax employee was on a litigation hold for an unrelated matter, such as a
medical malpractice case, the auto-deletion policy would have been suspended.  (*See e.g.,* Ex. 4
and 6 at Charts (showing if custodian had a prior, unrelated litigation hold).)  This case, however,
is the only one pending against Mednax relating to its billing and coding practices. Thus, the
subject matter of this case is fundamentally different than the other Mednax cases that prompted
an unrelated litigation hold.

worked at Mednax during the entire timeframe in dispute.  On the other hand, Mednax collected

approximately 70,000 e-mails from Ms. Klink's folders not long *after* the litigation hold went

into place.  In other words, as a result of the auto-delete aspect of the Mednax retention policy,

Mednax collected *seven times* more emails in the handful of months following the June 22, 2018

litigation hold, than it did from the timeframe of ***2012 through June 22, 2018***.  Unless Ms. Klink

suddenly started emailing at an alarmingly rapid rate after the hold went into place, it is likely

that hundreds of thousands of Ms. Klink's emails automatically "dropped off", are "gone

forever," and cannot be searched for responsive records.  (Ex. 3, Courcelle Dep. at 42-43.)  This

pattern is consistent across numerous Mednax witnesses/custodians, including with Ms. Kathleen

O'Hara, the Mednax executive in charge of "educating" Mednax physicians.[6]  (Ex. 18, O'Hara

Dep. at 9-11 (explaining job role).)

     In another example, Mednax issued no litigation hold letters to its Medical Directors in

connection with this case until December 2019. *See* Ex. 4, 1/31/20 letter (indicating Mednax

captured the email accounts of 51 Medical Directors on December 19, 2019).  Throughout

discovery, Mednax insisted that its Medical Directors did not have evidence relevant to this

litigation, and insisted that Aetna's requests that it search its Medical Directors' email accounts

was overly broad and burdensome – notwithstanding the fact that Mednax was actively deleting

these emails, such that when Mednax ultimately searched the email records of the paired-down

list of Medical Directors identified by Aetna, Mednax "[did] not maintain email for any [of the

Directors] from the relevant time period… due to Mednax's standard 90-day email retention

---

[6] For example, similar patterns appear with the following custodians:  Kathleen O'Hara, Jennifer Granberry, Dr. Michael Stanley, Marilou Pantoia-Smith, David Clark, Dr. Roger Hinson, Jason Clemons, John Pepia, Lee Wood, Arynn Elsdoerfer, James Krempler, Kristin Verhamme, Jamie Wilson, David Leung and many others.  *See* Ex. 16, at Litigation Hold Chart.

policy." (*See* Ex. 15, 12/18/19 letter at p.3). Mednax, however, has now gone so far as to identify nine "experts" under Rule 26(a)(2)(C), all of whom are employed physician Medical Directors (or "emeritus" directors) who, according to Mednax, have knowledge directly relevant to Aetna's claims, but for less than half of whom Mednax preserved and produced *any* records of which the physician was a custodian. (*Compare* Ex. 20, Rule 26(a)(2)(C) disclosures and Ex. 21, Supplemental Rule 26 (a)(2)(C) disclosures *with* Ex. 16, Litigation Hold Chart).

### D.   MEDNAX CLAIMS TO HAVE RECENTLY CONDUCTED AN INVESTIGATION AS TO THE FAILURE TO INSTALL LITIGATION HOLDS, AND CLAIMS TO HAVE CONCLUDED THAT IMPOSITION OF LITIGATION HOLDS JUST "SLIPPED" BY NUMEROUS LAW FIRMS AND IN-HOUSE COUNSEL FOR YEARS.

Likely anticipating this very motion, Mednax claims to have belatedly conducted some sort of an investigation into why Mednax's in-house and outside counsel failed to implement timely litigation holds, for years. To be sure, Aetna has no knowledge of whether an investigation actually occurred, the scope of the investigation, or what was used as the basis for the purported conclusion – wielding the attorney work product privilege as a shield, Mednax has refused to provide this information. Mednax claims that the investigation was conducted by attorneys from Robbins Russell. Mednax's counsel nonetheless has attempted to use the results of this purported investigation as a sword against Aetna's assertions of spoliation, permitting a corporate representative to recite the conclusion reached after the alleged investigation. At the same time, Mednax has asserted that any documents obtained, reviewed or created (such as interview notes) during the purported investigation are privileged. (*See* Ex. 5, Hawkins Dep. at 111-13.) In fact, Mednax's corporate representative on the topics—Mednax's former General Counsel who Mednax was paying $500/hour for his testimony, *see id.* at 23-24—stated that he did not participate in the alleged investigation and did not review *any* materials related to the investigation prior to testifying on that very topic. When pressed, Mr. Hawkins testified that

Mednax's current counsel simply provided him with the self-serving conclusion reached after this "investigation," that he did nothing to verify it, and that he simply took their word for it. (*Id.* at 111-13.) Thus, even if Mednax had not shielded the entire investigation, but for its conclusion, under the guise of privilege, its corporate designee on the topic was not prepared to testify about it.

In any event, even Mednax's description of the purported investigation and its apparent conclusion confirms that Mednax was at least egregiously reckless in failing to preserve evidence. For instance, Mednax has admitted that the need to impose litigation holds was discussed in at least two meetings with counsel. The first of these meetings allegedly occurred in March 2016—just a handful of months after Aetna placed Mednax on notice of Aetna's allegations. (*See* Ex. 52, Hawkins Dep. at 52.) The meeting included Mednax's internal and external counsel, and the meeting minutes allegedly reflect that litigation holds were discussed. (*Id.*; *see also id.* at 52-53 (Mednax counsel stating that the minutes are privileged.) Mednax's General Counsel, its Chief Legal Officer (Mary Anne More), and its outside counsel from Boies Schiller and Lash Goldberg were all present at the meeting. (*Id.* at 53, 82 (also identifying former General Counsel Tom Hawkins as attending the meeting); *id.* at 83 (noting that "interested executives and lawyers" attended the meeting).) While the issue of litigation holds was supposedly discussed, no litigation holds were implemented at that time. Mednax allegedly revisited the issue of litigation holds in February 2018. (*Id.* at 54-55.) Again, meeting minutes—which have been withheld as privileged—supposedly reflect that Mednax in-house counsel discussed the issue of litigation holds with the Quinn Emmanuel attorneys. (*Id.*; *see also id.* at 84-85 (noting that meeting minutes were prepared by Quinn Emmanuel); *see also id.* at 86 (testifying that Mary Anne Moore and Quinn Emmanuel counsel attended the meeting).)

In addition to locating these meeting minutes, Mednax's current counsel also claimed to have interviewed the internal and external attorneys who failed to ensure the implementation of litigation holds.   For example, attorneys from the Robbins Russell firm allegedly interviewed in-house counsel and current/former outside counsel, such as Nick Gravante of Boies Schiller, Luke Nikas of Quinn Emmanuel and Marty Goldberg of Lash Goldberg. (*Id.*)  Based on all of this work, Mednax's current lead counsel came to the factual conclusion that the issue of litigation holds merely "***slipped through the cracks***."  (*Id.* at 105 (emphasis added).)  That is, Mednax's attorneys from the Robbins Russell firm came to the factual conclusion that the issue of whether to install litigation holds in a major fraud litigation involving alleged damages of many tens of millions of dollars was not intentional, but merely "slipped" by the Chief Legal Officer of a publicly traded company, as well as numerous attorneys from Boies Schiller, Quinn Emmanuel, and Lash Goldberg for three and a half years, all while a 90-day email destruction policy was actively deleting evidence.

The issue of auto-deletion apparently did not come to the attention of current lead counsel from Robbins Russell for several months.  Robbins Russell entered their appearance on October 9, 2019.  Yet, there were no additional litigation holds put in place between October 9, 2019 and December 2, 2019.  (*See e.g.* Ex. 4 at Litigation Hold Chart).  Throughout this entire time period, more emails from many relevant custodians' e-mail accounts continued to be deleted permanently, even while Aetna had Motions to compel discovery pending.  (Ex. 3, Courcelle Dep. at 42-43.)

## **ARGUMENT**

"In determining spoliation sanctions, the Court must follow a two-step approach. First, it must determine whether the conduct at issue constitutes spoliation of evidence. Second, if

spoliation has occurred, the Court must determine the appropriate level of sanction to impose." *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 266 (W.D. Pa. 2012) (citing *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 74 n.5. (3d Cir. 2012)).  As to the first step, "[s]poliation includes 'the destruction or significant alteration of evidence, or the failure to preserve [or produce] property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *Bozic*, 912 F. Supp. 2d at 266 (quoting *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F.Supp.2d 332, 335 (D.N.J.2004)) (alternation in original).

As to the first prong, the Third Circuit recently detailed the four-factor test used to determine what actions constitute spoliation. "Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and [4] the duty to preserve the evidence was reasonably foreseeable to the party." *Indem. Ins. Co. of N. Am. v. Electrolux Home Prods.*, 520 F. App'x 107, 111 (3d Cir. 2013) (quoting *Bull*, 665 F.3d at 73); *see also Bozic*, 912 F. Supp. 2d at 266; *First Senior Fin. Grp. LLC v. Watchdog*, No. 12-cv-1247, 2014 U.S. Dist. LEXIS 45952, at *12 (E.D. Pa. Apr. 3, 2014)

"The touchstone of the *Bull* test, however, appears to . . . be a finding of 'bad faith.'" *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 269 (W.D. Pa. 2012). Bad faith is satisfied where: (1) "evidence is withheld or destroyed with the specific intent and purpose of keeping it out of the hands of a litigation adversary" or (2) there is a "reckless disregard" for the consequences of destroying or failing to preserve evidence.  *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 269 (W.D. Pa. 2012) (finding prong 3 was satisfied where the party "was reckless as to the consequence of [his] action" because that satisfies "the *Bull* 'bad faith' standard" despite the fact that the Court found that he did not have "specific malicious intent of keeping the record from"

the parties or the Court); *see also First Senior Fin. Grp. LLC v. Watchdog*, No. 12-cv-1247, 2014 U.S. Dist. LEXIS 45952, at *24 (E.D. Pa. Apr. 3, 2014). Here, there is ample evidence of bad faith on the part of Mednax.

### A. AETNA HAS ADDUCED SUBSTANTIAL AND SPECIFIC EVIDENCE OF SPOLIATION.

Aetna has adduced specific and voluminous evidence to show that each of the four *Bull* factors has been met. Accordingly, Aetna has satisfied the first prong of the applicable spoliation analysis.

### 1. THE E-MAIL RECORDS AT ISSUE WERE PLAINLY IN MEDNAX'S CONTROL.

The first *Bull* factor asks whether the evidence in question was within the possession or control of the entity accused of spoliation. Here, there is no question that the evidence at issue was within Mednax's possession and control. Aetna's motion concerns e-mails (and corresponding e-mail attachments) that previously existed on Mednax e-mail servers, but were deleted as a result of Mednax's 90-day rolling and automatic deletion policy. All Mednax employees have Mednax e-mail addresses and their e-mails were possessed by Mednax. (*E.g.,* Ex. 3, Courcelle Dep. at 30-31, 33 (noting that all Mednax employees, including physicians, had Mednax e-mails addresses on either current Office system or prior First Class system); *see also* Ex. 11 (stating Mednax would not be identifying any practice groups for whom it would *decline* to produce records).) Thus, there is no question that Mednax did possess the records at issue.

### 2. MEDNAX CONCEDES IT ANTICIPATED THIS LITIGATION AS EARLY AS 2015.

Next, there is no question that Mednax anticipated this litigation many years before it installed the first litigation holds. "A party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence." *AMG Nat'l Trust Bank v. Ries*, 2011 WL

3099629, at *4 (E.D. Pa. July 22, 2011). "The standard is objective, asking not whether the party in fact foresaw litigation, but whether a reasonable party in the same circumstances would have reasonably foreseen litigation." *First Sr. Fin. Grp., LLC v. Watchdog*, 2014 WL 1327584, at *9 (E.D. Pa. Apr. 3, 2014). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation ... as for example when a party should have known that the evidence may be relevant to future litigation." *Rogers v. Allstate Ins. Co.*, 2012 WL 5250513, at *5 (E.D. Pa. Oct. 23, 2012). To determine whether a party "should have known that the evidence may be relevant," courts consider a variety of factors, including the course of conduct between the parties and what steps parties took before the loss of the evidence. *Bistrian v. Levi*, 2020 WL 1443735, at *5 (E.D. Pa. Mar. 24, 2020).

Here, it is undisputed that Mednax anticipated litigation with Aetna. Aetna informed Mednax of its allegations in January and November of 2015. Mednax, in turn, informed its Board of Directors of Aetna's allegations in February and November of 2015. The parties met on January 15, 2016, during which Aetna made a 63-page presentation laying out Aetna's allegations and the statistical analysis that supported those allegations. Thereafter the parties signed a tolling agreement and met several times between January 2016 and the end of 2017. Further, Mednax has withheld dozens of documents that were created as early as November 2015 on work product grounds. By doing so, Mednax is taking the position that it need not produce the records because at the time (November 2015 through December 2017) Mednax anticipated the "instant" litigation. In fact, Mednax is withholding email communications from November 2015 which "reflect[] the thoughts and metal impressions of counsel **regarding Aetna's allegations** and prepared by or at the direction of counsel **in anticipation of the instant litigation**," and an email chain between Mednax personnel "providing information requested by

counsel to render legal advice **regarding Aetna's allegations** and prepared at the request of counsel **in anticipation of the instant litigation**." (*See, e.g.* Ex. 2 Log at Entries 190 and 191 (emphasis added).

Therefore, Mednax anticipated litigation throughout 2015-2018. It was under a duty to preserve documents throughout that entire time period and "once this duty to preserve arises, a litigant must 'suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'" *Dunn*, 2012 WL 424984, at *5. Mednax failed to do so, despite apparently discussing the issue several times with counsel. Aetna has plainly satisfied this prong of the spoliation analysis.

### 3.   MEDNAX SUPPRESSED AND DESTROYED EVIDENCE

For purposes of the next *Bull* prong—*i.e.*, the destruction of evidence—it is undisputed that Mednax destroyed what likely amounts to hundreds of thousands (if not millions) of e-mail records. Mednax did so by failing to implement litigation holds and clearing the way for the 90-day rolling destruction of e-mail records to continue for many years. It is impossible for Aetna to know the exact number of the e-mails that were destroyed or the content of those e-mails, because those emails "dropp[ed] off" permanently and were never available for any party to collect, produce, or review. Mednax's own blatant failure to act—despite being represented by large, prominent law firms—was the sole cause of these records being unavailable. This misconduct, which is at least egregiously reckless, resulted in the widespread destruction of potentially relevant and responsive records. Mednax's conduct constitutes "bad faith," which is sufficient to satisfy this prong of the *Bull* test.

As noted above, the focus of the *Bull* test centers on a finding of bad faith. *Bozic*, 912 F. Supp. 2d at 269. Bad faith is satisfied where there is a "reckless disregard" for the consequences

of destroying or failing to preserve evidence. *Id.* (finding the destruction/bad faith prong of the *Bull* analysis was satisfied where the party "was reckless as to the consequence of [his] action" because that satisfies "the *Bull* 'bad faith' standard" despite the fact that the Court found that he did not have "specific malicious intent of keeping the record from" the parties or the Court); *see also First Senior Fin. Grp. LLC v. Watchdog*, No. 12-cv-1247, 2014 U.S. Dist. LEXIS 45952, at *24 (E.D. Pa. Apr. 3, 2014). Here, Defendants' conduct was at least reckless, and an evidentiary hearing—at which the Court can assess the credibility of Mednax's witnesses—will confirm this. For example:

- Defendants knew of Aetna' allegations in 2015, notified their Board of Directors about the allegations, and began to prepare internal documents in anticipation of the litigation;

- At the same time, Defendants knew that they maintained a 90-day email destruction policy and knew that emails were being destroyed every single day, but took no action to halt that policy and the corresponding impact on the availability of records for this litigation;

- The parties met numerous times throughout 2016, at which time Aetna shared its detailed statistical findings with Mednax, putting Mednax on even further notice of Aetna' claims;

- Recognizing the serious nature of Aetna's claims, Mednax hired multiple outside law firms to defend Mednax against Aetna's allegations, including the prominent Boies Schiller law firm;

- These outside lawyers met with Mednax's General Counsel and Chief Legal Officer to discuss the matter in early 2016, discussed litigation holds, but again took absolutely no action to halt the destruction of potentially relevant information;

- The parties met again several times in 2017, including with numerous partners from outside firms present to represent Mednax—again, no litigations holds were imposed at all in 2017 and Mednax permitted its 90-day email destruction policy to continue rendering email records "gone forever";

- Aetna filed a writ of summons in November 2017 and then filed a Complaint in April of 2018, but Mednax did not impose any legal holds ***at all*** under June 22, 2018, when Mednax imposed a measly ten (10) legal holds;

i    During the initial discovery period in this case, Mednax took the false position
     that email records from physicians around the country were not in Mednax's
     possession, despite the fact that Mednax counsel either knew, or should have
     known, that Mednax physicians' emails were indeed stored on Mednax
     servers, *see* Ex. 10, 11/30/2019 email; *see also First Senior Fin. Grp. LLC v.
     Watchdog*, No. 12-cv-1247, 2014 U.S. Dist. LEXIS 45952, at *24 (E.D. Pa.
     Apr. 3, 2014) (a party's obfuscation or lying can show that she is acting in bad
     faith);

i    After being directed by this Court to provide a basis for why it would not
     produce documents on behalf of any of its physician groups, Mednax
     represented to Aetna that it would produce documents on behalf of all of its
     neonatal physician practices. Mednax nonetheless took no steps to preserve
     documents held by custodians within these groups while it contested Aetna's
     request that they be treated as custodians. Mednax has since identified a
     number of Medical Directors of those groups as possessing information
     directly relevant to Aetna's claims. Mednax has produced records from the
     custody of less than half of these individuals;

i    While the parties were disputing and filing motions relating to Mednax's need
     to add numerous additional custodians, Mednax took no additional action in
     2018 to impose additional litigation holds in the event Aetna's position was
     credited by the Court (it was) and took only minimal action in April 2019 to
     address a small subset of the custodians involved;

i    At no point from January 2018 through December 2019 did Mednax ever
     reveal that it maintained a 90-day destruction policy and at no point did
     Mednax reveal that the destruction continued completely unabated from 2015
     through the middle of 2018;

i    Mednax first informed Aetna of the existence of the policy only when its
     initial lead counsel was fired and new counsel apparently discovered the
     problem in December 2019, at approximately the same time at Mednax was
     forced to comply with Court Orders granting Aetna additional discovery into
     numerous topics; and

i    Mednax—a publicly traded company with a robust internal legal
     department—and the copious numerous of outside counsel representing
     Mednax discuss litigation holds two times, failed to act, and permitted the
     destruction of likely millions of records to—in their current counsel's
     words—"slip through the cracks."

Mednax failed to protect potential evidence in this case, despite being aware at all times

that the records were being destroyed on a daily basis.  Mednax and its counsel discussed

installing litigation holds multiple times and still failed to act.  As a result, Aetna is severely

prejudiced because an unknowable number of potentially responsive email records are gone

forever.  In these circumstances, there can be no doubt that Mednax's conduct rises to the level

of bad faith and reckless disregard required under the *Bull* analysis. *Bozic v*, 912 F. Supp. 2d at

273  (finding that defendant acted in reckless disregard for consequences of destroying the

evidence and that reckless disregard does rise to the level of bad faith spoliation); *Victor Stanley,*

*Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497 (D. Md. 2010) (finding bad faith spoliation where

"[d]efendants deleted thousands of files and ran programs to ensure their permanent loss

immediately following preservation requests and orders, and immediately before scheduled

discovery efforts", and ruling that once the preservation duty is triggered, a party is obligated to

suspend a document retention or destruction policy and implement a litigation hold to ensure the

preservation of relevant documents); *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 121 (S.D.N.Y.

2008) (company's failure to preserve existing backup tapes subsequent to 2003, when company

unquestionably was on notice of duty to preserve tapes containing documents of key player in

litigation, was grossly negligent or reckless, and provided culpable state of mind for adverse

inference instruction as sanction for spoliation of evidence); *U.S. v. Philip Morris USA, Inc.*, 327

F.Supp.2d 21, 26 (D.D.C. 2004) (imposing $2.9 million fine and costs for defendant's failure to

preserve two years' worth of relevant e-mails despite a court order to do so reasoning the

sanctions "fully effect the reckless disregard and gross indifference displayed toward their

discovery and document preservation obligations"); *In re Telxon Corp. Sec. Litig. v.*

*PriceWaterhouseCoopers, LLP*, No. 1:01CV1078, 2004 WL 3192729, at *33 (N.D. Ohio July

16, 2004) ("Prior to litigation PwC had permitted destruction of documents despite committing

to their preservation. Despite these failures, PwC time and time again told the court and the

parties that it had made a complete disclosure of all relevant documents and attachments and that it had produced them in the order in which they were stored by PwC. The only conclusion the court can reach is that PwC and/or its counsel engaged in deliberate fraud or was so recklessly indifferent to their responsibilities as a party to the litigation that they failed to take the most basic steps to fulfill those responsibilities.").

In response to the undisputed nature of its spoliation, Mednax will no-doubt point to what it refers to as the "email loop" and claim that it retained emails that were generated by that automated process.  Specifically, Mednax maintains an electronic billing and coding system generally referred to as "BabySteps."  The BabySteps system—based on practically zero, relevant clinical information—automatically generates a code for a physician to bill for treatment provided to a particular infant on a particular day.  If the physician disagrees with the code generated by BabySteps, if the BabySteps software is not able to generate a code, or if the provider selects an option within the software known as the "morbidity and mortality" statement, the claim is flagged for review by an employee within Mednax's coding department.  If the coder thinks the physician has not selected the correct code, he or she uses a software system referred to as "OBR" to send a templated email to the physician asking them to reconsider their coding decision. The physician must thereafter respond to the email from the coder, and either go along with the recommended change or stand on their original coding decision.  This correspondence cycle is referred to as the "email loop."  Mednax has represented that its "email loops" – including the follow-up correspondence between physician and coder that can include escalations to supervisors – are not subject to the 90-day deletion policy, and that all available email loops have been produced.

However, Mednax's preservation of these "email loop" emails and their subsequent chains is not complete. Mednax has produced records in connection with its audits of physician practice groups (records that were physically printed from Mednax's email system and saved as paper files, and then produced in this case) that are part of "email loop" exchanges that were not produced within Mednax's "email loop" production. (*See e.g.,* Ex. 22, Mednax 782531-32 (reflecting communication within coding department that was not preserved as part of email loop). These records were preserved by chance, as part of practice audits. Aetna has no way of knowing how many other emails that were part of email-loop exchanges – which by their very nature involve physicians disagreeing with coding suggestions made by Mednax corporate employees – were deleted as a result of the 90-day email destruction policy. Indeed, Mednax has separately obstructed Aetna's efforts to obtain information regarding this very system.

These automated emails also do not account for, or otherwise lessen, the prejudice that Aetna faces due to the destruction of hundreds of thousands of other email records, the contents of which will never be revealed. For instance:

i   Mednax did not preserve correspondence among Mednax corporate officials concerning, for example, business pressure to code at higher levels. Mednax has an entire business operations department focused on the business performance of its underlying practice groups and internal communications among those responsible for the oversight could have revealed pressure or benchmarks placed upon practice groups to reach certain revenue levels.

i   Mednax did not preserve correspondence at the corporate level relating to the "education" of physician groups both (a) when they join or are acquired by Mednax; or (b) when the practice groups fail to code and bill in a manner that meets what Aetna contends to be the Mednax way. Aetna asserts that when Mednax acquires a new group or meets with an underperforming group, Mednax imposes a standard of billing that leads to higher and more expensive codes—indeed, it is through this process that Aetna contends Mednax "encourages" physicians to bill in a manner that is consistent with BabySteps (which, in turn, reduces the need for the "email loop" in the first place). Email records relating to this "educational process" were not preserved and thus not available for collection and production.

25

i   Mednax did not preserve correspondence from within its practice groups. Complaints by physicians concerning Mednax's corporate practices—including the Mednax billing and coding regimen—are most likely to come up between physicians in the same practice group. Yet, Mednax failed to preserve records that would allow for the review. In fact, Mednax initially claimed that it did not even maintain such records, although that turned out to be a false and misleading representation.

i   Mednax did not preserve records that would reflect complaints or concerns raised by the various Medical Directors of the practice groups. Each practice group has a Medical Director and that individual is the person most likely to communicate complaints concerning Mednax's business practices to Mednax's corporate offices. Again, because no holds were in place, emails conveying concerns, disagreements, or complaints from Medical Directors to Mednax's corporate offices were very likely deleted. Medical Directors are also the most likely to discuss compensation issues with Mednax corporate—including conversations concerning increased or decreased compensation based on performance.

i   Mednax did not preserve records and communications among its Coding Department employees. Those communications could have included concerns about overbilling or upcoding. Likewise, those communications could have included directives from more senior personnel concerning how to achieve more intensive and expensive codes for the bills. There is direct testimony that this type of instruction occurred, but if it was conveyed in emails that predate litigation holds, those emails are gone forever.

i   Mednax did not retain email records relating to alterations made to the BabySteps software—including email communications relating to why certain changes were, or were not, implemented. The BabySteps software—again, based on scant clinical information—generates the codes that end up on bills to Aetna. Emails relating to changes made to BabySteps or concerns about the impact of BabySteps are likewise unavailable.

i   Mednax did not preserve records relating to the targeting of physician groups for acquisition. These records would include correspondence regarding expected revenue, educating new groups to meet the Mednax billing practices, and expected compensation for new groups.

These are just some examples of the vast number of categories of information that are no longer available to Mednax and, therefore, could not have been reviewed and produced in this case. It is impossible to know precisely how many emails were deleted or the content of those

emails because Mednax's own policy dictates that the emails are gone forever. This is not Aetna's fault—Mednax's own policy ensures this result, and scores of Mednax attorneys let it happen for more than 3.5 years. This is spoliation of evidence.

Importantly, Aetna is not claiming that every single employee within Mednax may have previously had records that would support Aetna's case. Aetna is focused on two critical points: (1) no litigation hold ***at all*** was in place from January 2015 through June 2018 and (2) even after the holds were put in place for a handful of individuals, a vast majority of relevant actors (including Medical Directors, individuals charged with financial oversight, executives, etc.) were left with no hold for another year-and-a-half. These are individuals in highly relevant positions. It is thus reasonable for Aetna and the Court to assume that they had relevant information in their possession before the Mednax auto-delete policy was finally shut off. *Orion Drilling, LLC v. EQT Production Company*, Civil Action No. 16-1516, 2018 WL 4344980 at *2 (W.D. Pa. Sep. 11, 2018) (highlighting relevance of the position held by individual whose records were lost).

Simply put, Mednax failed to preserve evidence over the course of many years, that evidence is gone forever, and numerous lawyers let it happen. This is amounts to bad faith and thus Aetna satisfies the remaining factors in the *Bull* analysis.

### B.   AETNA SEEKS, AT A MINIMUM, AN ADVERSE INFERENCE IN ITS FAVOR.

Aetna has established that Mednax spoliated evidence and that it did so in bad faith. Therefore, the first *Bull* factor is satisfied and the Court must next evaluate the sanction to impose on Mednax. Aetna seeks, at a minimum, an adverse inference in Aetna's favor. Specifically, Aetna seeks an instruction from the Court to the jury that Mednax destroyed evidence and that but for this destruction of evidence, emails records would have been available and those email records would have supported Aetna's position in this case.

27

Given the widespread destruction of records, an adverse inference in Aetna's favor is an appropriate remedy.  Aetna is not—at this stage, and prior to a hearing—seeking judgment or a more severe sanction.  But, the Court cannot permit Mednax's reckless conduct go unchecked.  For years, Mednax destroyed email after email on an automated basis, and numerous in-house and outside attorneys permitted this to happen every day.  Mednax, a sophisticated and publicly traded company, cannot avoid significant spoliation sanctions simply by saying that the issue "slipped through the cracks," particularly given that Mednax refuses to even reveal the content of the alleged investigation that led to this conclusion.

Put simply, Mednax destroyed what likely amounts to hundreds of thousands of emails, and as numerous courts have found, an adverse inference is an appropriate sanction in these circumstances.  *See Gn Netcom, Inc. v. Plantronics, Inc.,* 930 F.3d 76, 84-85 (3d Cir. 2019) (affirming district  court's imposition of permissive adverse inference instruction on defendant competitor for its executives' deletion of e-mails in response to pending antitrust litigation; "[the district court] determined that, because some of the relevant emails were recovered, a permissive adverse inference instruction would be effective as it would allow the jury to see the types of recovered e-mails and draw conclusions about what the deleted emails contained"); *Bozic*, 912 F. Supp. 2d at 273 (holding the spoliation inference was appropriate to remedy the prejudice imposed on plaintiff and the process in adjudicating the case where defendant intentionally destroyed a tape recording relevant to plaintiff's underlying employment discrimination claims (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994); *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.*, 348 F.Supp.2d 332, 338 (D.N.J. 2004) (noting that spoliation inference serves remedial function and levels the playing field). *Cf Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) ("The general principles

concerning the inferences to be drawn from the loss or destruction of documents are well
established. When the contents of a document are relevant to an issue in a case, the trier of fact
generally may receive the fact of the document's nonproduction or destruction as evidence that
the party that has prevented production did so out of the well-founded fear that the contents
would harm him." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)
(citations omitted).)

     In *Mosaid Technologies, Inc.*, the district court affirmed the magistrate judge's
imposition of a spoliation adverse inference instruction based on conduct nearly identical to
Mednax's here.  In *Mosaid Technologies, Inc.*, the defendant failed to implement a timely
litigation hold or "'off-switch' on its document retention policy concerning emails."  348 F.
Supp. 2d at 333.   As a result of the defendant's failure to implement a litigation hold, the
defendants "automatic computer e-mail policy" remained "unchecked" and "allowed e-mails to
be deleted, or at least inaccessible, on a rolling basis."  *Id.*  Not only did the defendant fail to
implement a litigation hold when the lawsuit first began, the defendant similarly failed to
implement a litigation hold after it received the plaintiff's discovery requests, which sought the
production of email communications.  *Id.* at 338.  The court found the defendant "willfully
blinded itself" to the plaintiff's discovery requests to take the position it "had no obligation to
prevent [the emails] continued destruction while [the] litigation continued."  *Id.*  The court
emphasized the fact the defendant did not take any steps to preserve emails until three years after
the litigation began, only after the court issued its spoliation adverse inference opinion.  *Id.* at
339.  The court found the defendant's conduct in failing to timely implement litigation holds
resulting in the destruction of evidence to be "knowing and intentional."  *Id.*  at 338.

Here, as in *Mosaid*, Mednax failed to timely implement litigation holds for a period of over three years despite anticipating this "instant litigation" in November 2015.  Identical to the defendant in *Mosaid*, as a result of Mednax's failure to implement litigation holds, Mednax's 90 day email destruction policy ran "unchecked" and deleted hundreds of thousands of emails "on a rolling basis" from key witnesses concerning the very subjects of Aetna's requests for production of documents.  Mednax "willfully blinded" itself from its discovery obligations despite having engaged in years of ongoing settlement discussions with Aetna regarding the claims at issue here, having entered into a tolling agreement with Aetna, having been sued by Aetna, having received Aetna's requests for the production of documents, having the guidance of this Court's discovery orders commanding production of documents which should have been preserved, and having the representation of three prominent law firms beginning from 2015.  Here, as in *Mosaid*, this Court should find Mednax's spoliation of evidence warrants the imposition of sanctions via the introduction of an adverse inference spoliation instruction to the jury.

### C.   AETNA SEEKS AN EVIDENTIARY HEARING TO FULLY ASSESS THE SCOPE OF DEFENDANTS' SPOLIATION AND THE APPROPRIATE REMEDY

In connection with Aetna's Motion, Aetna seeks an evidentiary hearing to assess the scope of the Mednax's spoliation.  Aetna is prepared to present its evidence in person or via an electronic hearing due to COVID restrictions on in-person gatherings and travel, and defers to the Court's preference in that regard.

## CONCLUSION

For all the foregoing reasons, Aetna respectfully requests that the Court grant Aetna's Motion and schedule an appropriate hearing to accept testimony and evidence to fashion an appropriate sanction against Mednax.

Respectfully submitted,

*/s/ Mark J. Schwemler*
MARK J. SCHWEMLER
COLIN J. O'BOYLE
AIMEE L. KUMER
ANDREW ESTEPANI
ELLIOTT GREENLEAF P.C.
925 Harvest Drive, Suite 300
Blue Bell, Pennsylvania 19422

Dated:   March 1, 2021

HOWARD PIERCE, *pro hac vice*
PIERCE LLC
433 S. Main Street, Suite 228
West Hartford, CT 06110

*Counsel for Plaintiffs*