IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA INC., AETNA HEALTH, INC., AETNA HEALTH MANAGEMENT LLC, AND AETNA LIFE INSURANCE COMPANY,<br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>MEDNAX, INC., PEDIATRIX MEDICAL GROUP, INC., AND MEDNAX SERVICES, INC.,<br>　　　　　Defendants. | CIVIL ACTION<br><br><br><br><br>NO. 18-2217 |

## MEMORANDUM OPINION

Plaintiffs are affiliated health insurance companies Aetna Inc., Aetna Health, Inc., Aetna Health Management LLC, and Aetna Life Insurance Company (collectively, "Aetna") which allege that Defendants Mednax, Inc., Pediatrix Medical Group, Inc., and Mednax Services, Inc. (collectively, "Mednax"), affiliated companies that provide management and financial operations services to physician groups, fraudulently inflated insurance claims for services rendered in neonatal intensive care units ("NICUs"). After fact discovery closed, Aetna produced the report of its damages expert, Dr. Michael Cragg (the "Cragg Report"), which calculated damages arising from two sources: (1) the amount Mednax fraudulently induced Aetna to pay Mednax, approximately $58.3 million; and, (2) the amount Mednax fraudulently induced Aetna to pay hospitals in which Mednax physicians practiced, approximately $102.7 million.

Mednax now moves to strike the second damages theory pursuant to Federal Rule of Civil Procedure 37(c)(1). For the following reasons, Mednax's motion will be granted.

I.　　BACKGROUND

Aetna's suit, for fraud, negligent misrepresentation, money had and received, unjust

enrichment, and civil conspiracy, alleges that Mednax engaged in "a scheme to defraud Aetna" in which Mednax "intentionally and systematically overbilled Aetna" by "fraudulently inflating the severity of the clinical condition of their newborn patients on bills that Mednax submit[ted] to Aetna for reimbursement," and requiring Mednax physicians to "designat[e] infants as being sicker than they truly were so that it appeared as if the infants required more intensive treatment than was truly the case."  In support of its allegations, the Complaint relies on a statistical analysis of "tens of thousands of claims submitted by Mednax to Aetna for reimbursement," which the Complaint alleges "shows unequivocally that Mednax billed for services in a manner that far exceeded comparable non-Mednax physician groups" even after "adjust[ing] for or rul[ing] out" factors that could account for the differences in Mednax's billing.  Among other factors, the Complaint explains, Aetna "adjusted for or ruled out" the "Severity of [the] Patient's Condition," stating, "Mednax patients' conditions are not more severe than non-Mednax patients, nor did Mednax patients have longer length of stay."

The Complaint alleges that "[u]pcoding and billing of unnecessary tests by Mednax resulted not only in excessive payments to Mednax, but also in inflated payments to hospitals in which tests were performed and NICUs were housed."  As a result of Mednax's fraud, the Complaint summarizes, "Aetna has paid more than $50 million more than it should have to Mednax.  Aetna brings this action to recover these overpayments."

At the outset of the litigation, as required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Aetna disclosed to Mednax its "computation of each category of damages claimed," stating that "[w]ithout limitation, Aetna seeks damages in the amount still to be determined, but exceeding $50 million, representing the overpayments that Defendants fraudulently induced Aetna to make."  Mednax proffers without contradiction by Aetna that

2

Aetna has not served a supplemented version of its Rule 26 damages disclosures.

Following closure of fact discovery Aetna timely served on Mednax the Cragg Report which purports to "calculate the excess payments Aetna paid as a result of Mednax's overbilling for the treatment of newborn children," ultimately calculating that Aetna is owed approximately $161 million from the two sources of damages noted above.  First, the Cragg Report focused on Mednax's use of evaluation and management ("E/M") medical procedure codes, which divide medical procedures for newborn patients into four categories: newborn, hospital, intensive, and critical.  The Cragg Report found damages of approximately $58.3 million from two forms of E/M code overbilling: (1) "for a NICU stay of a given length . . . Mednax bills more intensive and critical E/M procedures as opposed to less expensive newborn and hospital E/M procedures"; and, (2) "Mednax keeps newborns in the NICU longer on average," which "also results in Mednax billing more E/M procedures."  Second, the Cragg Report calculated damages from "extra payments *to hospitals* resulting from the overly long NICU stays for newborns under Mednax's care."  The Cragg Report explained, "Aetna's payments to hospitals compensate the hospitals for providing care and resources to the newborn via revenue codes. . . .  Since hospital payments are larger the longer a newborn spends in the NICU, Mednax's behavior of extending NICU stays resulted in Aetna paying more to hospitals than it otherwise would."  By the Cragg Report's calculations, Mednax's fraud caused Aetna to overpay hospitals $102.7 million.

Mednax now moves to strike this second damages theory as sanction for Aetna's failure to timely disclose it.  According to Mednax, not only did Aetna fail to timely disclose that it was seeking damages for the amounts it paid to hospitals, but it also repeatedly denied during fact discovery that it sought such recovery and refused to respond to Mednax's discovery regarding the same.  Aetna contends that sanction is unwarranted, citing its broad Rule 26 disclosure, the

Complaint's allegation that Aetna overpaid hospital claims, and Aetna's repeated representations to Mednax that, per Aetna's brief in opposition, it "intended to support its claim with an emphasis on expert reports." As set out below, however, the crux of the instant dispute lies in Aetna's representations during fact discovery that payments made to hospitals were not relevant to the case.

### A. Deposition of Richard Harris

During discovery, Mednax requested pursuant to Rule 30(b)(6) that Aetna designate a corporate representative to testify about the damages in excess of $50 million claimed in Aetna's Complaint and initial disclosures, "includ[ing] but [] not limited to the method for calculating those amounts, . . . [and] whether and how Aetna's calculation of its claimed damages has changed since the filing of the Complaint." Aetna objected on, among other grounds, that the request was "overbroad" and "seeks information that is not relevant . . . to the needs of the case." The parties took their dispute to the Special Discovery Master[1] who recommended that Aetna "produce a witness to testify about the basis for the damages figures in its complaint and initial disclosures," but cautioned that "questioning regarding the details of the damages methodology likely would be inappropriate." Aetna designated one Richard Harris as their 30(b)(6) witness who at deposition when asked by Mednax if he was "prepared to offer any testimony" on Mednax's damages, stated in relevant part, "[a]ll I can say is this analysis was prepared by an outside expert. It has been produced. And anything that has not been produced is privileged."

### B. Mednax Requests for Production ("RFPs") 108 and 110

During the course of the litigation, Aetna produced a dataset with information for all of Aetna's NICU claims from 2009 to February 2019 (the "August Data"). Mednax subsequently

---

[1] The Court appointed Bruce Merenstein, Esquire, as Special Master after it became clear that almost every aspect of discovery was to be hotly contested.

served RFPs 108 and 110, seeking more information about the August Data.  Specifically, it requested that Aetna produce documents and data related to Aetna's "Clinical Claim Review" and "Utilization Review" – processes in which Aetna monitors, assesses, and authorizes care for insured patients – of claims reflected in the August Data.  Aetna objected that such discovery was "overly broad, unduly burdensome, and not proportionate to the needs of the case," and that Mednax "is requesting information that it possesses" because Mednax "is aware of how its claims are adjudicated."  It subsequently objected (by way of letter) to production of the documents and data on the grounds that "Aetna does not perform utilization review or clinical review" of physician E/M codes.  "[T]hose reviews," Aetna's letter explained, "are focused on facility claims" – that is, claims hospital facilities submitted to Aetna – and "[t]hus, claims at issue in this case will not have been the focus of utilization review or clinical review."  Aetna's letter continued, production of "information regarding any time Aetna has reviewed medical records from hospital facilities that somehow implicate care provided [by a] Mednax physician" would be "extremely disproportionate to the needs of the case, and for records that are not relevant to the issues in this matter."[2]

### C.  Mednax RFPs 103 and 104

Mednax also served RFPs 103, 104, and 107, which requested production of Aetna's policies, guidelines, and procedures for the medical coding of NICU claims and Aetna's review

---

[2] The record indicates that Aetna did ultimately produce at least some records responsive to RFPs 108 and 110.  On July 20, 2020, Mednax requested that the Special Master recommend that Aetna be compelled to produce documents relating to Aetna's review of hospital and physician claims submitted in connection with the medical care of patients Aetna alleged were the subject of "upcoded" Mednax claims.  Mednax contended that such records were responsive to RFPs 108 and 110, *inter alia*, and relevant to show whether "Mednax's billing for these patients was appropriate" and "Aetna should have detected (or did detect) the alleged upcoding of these claims earlier," noting that "[w]hile Mednax has information concerning Aetna's final adjudication of claims *it* submitted, it does not have . . . [Aetna's] communications made directly with the hospital facilities."  In a letter to the Special Master, Aetna ultimately agreed to produce Mednax's requested materials for four patients, although Aetna explained that it "stands by its objections."

of such claims. Aetna also objected to these requests as being "overly broad and unduly burdensome" and "not relevant to the parties claims and defenses." It also asserted that it had already "produced those policies regarding its review and payment of invoices submitted by Mednax." Mednax took the matter to the Special Master, requesting that Aetna be ordered to produce documents "concerning Aetna's processes, guidance, and standards for evaluating the clinical appropriateness and utilization of NICU coding."[3] Aetna reiterated its position that such "discovery is not relevant, as it relates to Aetna's review of services rendered by the hospital (not by a Mednax physician)." Because "Aetna does not perform utilization review or clinical review" of E/M codes used by Mednax physicians, but only of "facility (*i.e.* hospital) claims," Aetna explained, "claims at issue in this case will not have been the focus of utilization review or clinical review."

The Special Master was unmoved by Mednax's arguments and, on July 29, 2020, recommended (the "July 29 Recommendation") that Aetna produce "processes, guidance, and standards for evaluating the clinical appropriateness and utilization of NICU coding," including those Aetna relies on "for evaluating whether clinical decisions or coding determinations that are part of Aetna's claims in this case (*e.g.*, admission of a patient to a NICU, discharge of a patient from or continued hospitalization in a NICU) are appropriate, and whether, as a result of such review, a claim should be paid (in full or in part)." Aetna produced only three documents responsive to the Special Master's recommendation, explaining in its transmittal e-mail that "[n]otably, these do not directly bear on the claims at issue in this case, however, because they

---

[3] It bears noting that although Mednax's letter asserted several reasons why the requested discovery was relevant, including to show "how Aetna reviews the coding and clinical aspects of claims submitted by Mednax and other neonatal providers," "Aetna's reliance and the timing of its discovery of the alleged fraud," and for "potential impeachment of Aetna's clinical and expert witnesses who will address coding by Mednax-affiliated physicians," Mednax did *not* argue that such discovery was relevant to limit Mednax's potential liability for Aetna's hospital payments.

6

focus on the review of the facility claim and not the provider's claim."

### D.  Deposition of Kay Rooker, R.N.

During discovery Mednax deposed Kay Rooker, R.N., a manager in Aetna's Clinical Claim Review Department, about Aetna's clinical claim review processes.  Rooker testified that Aetna has one clinical claim review divisions that conducts "live claim review of [medical] services," and a second division that reviews claims submitted by hospitals that use "DRG" billing codes.  Among other details, Rooker testified that Aetna maintains a list of DRG codes that are excluded from Aetna's "prepay review" process.  After the deposition, Mednax requested that Aetna produce documents that Mednax explained it learned of "for the first time" during Rooker's deposition, including, *inter alia*, the "DRG exclusion list, and documents "sett[ing] out the work flow and criteria" used in clinical review of hospital claims for NICU services.

Aetna refused to provide the documents, explaining that "when a facility's NICU claims are submitted, the physician's claims are not subject to review at that time[,]" and reiterating that the "DRG exclusion list . . . has nothing to do with this case" because "[o]nly facilities submit claims to be paid base upon a 'DRG' rate," and only the E/M codes Mednax submitted for reimbursement of physician claims "are at issue in this litigation."  Mednax disputed that Aetna's review of hospital claims was irrelevant, responding that the Special Master had, in his July 29 Recommendation, "concluded that discovery into Aetna's review of facility claims for NICU services was relevant."  Aetna nevertheless refused Mednax's supplementary requests for production, arguing that Mednax mischaracterized the July 29 Recommendation:

> [The Special Master] did not [] "conclude" that Mednax was entitled to engage in broad discovery into "Aetna's review of facility claims for NICU services" as it now attempts to do here.  Mednax does not submit facility claims.  Aetna does not seek to recover[] facility claims in this lawsuit. . . .  As such, Aetna objects to

7

Mednax's efforts to expand the scope of discovery.

Despite this disavowal, on October 26, 2020, Aetna served the Cragg Report, which calculated that Aetna's damages for hospital claims were $102.7 million. When Mednax requested that, in light of the Cragg Report, Aetna produce documents concerning its review, processing, and payment of NICU hospital claims, Aetna refused the request as an "attempt[] to reopen discovery months after the close of document discovery."

## II.  DISCUSSION

"Strategic manipulation of the discovery process, especially with regard to such critical disclosures as the theory of damages is the ill toward which Rule 26 and Rule 37 are aimed." *Mercedes Benz USA LLC v. Coast Automotive Grp. Ltd.*, 2008 WL 4378294, at *5 (D.N.J. Sept. 23, 2008) (citation omitted). Pursuant to Federal Rule of Civil Procedure 26, a party must "provide to the other parties . . . a computation of each category of damages claimed by the disclosing party," and supplement this disclosure "in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(a)(1)(A)(iii), 26(e)(1)(A). Under Rule 37, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"Rule 37 is written in mandatory terms, and is designed to provide a strong inducement for disclosure of Rule 26(a) material." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995) (internal quotation marks and citations omitted). It is an "automatic sanction" designed to laser focus a party's attention on the production of "material" that the party "would expect to use as evidence." Fed. R. Civ. P. 37(c)(1) (Advisory Committee

8

notes to 1993 Amendments). The Rule does, however, provide some discretion to ameliorate its potentially harsh effects. Specifically, a party can overcome Rule 37 sanctions by demonstrating that a Rule 26 contravention was "'substantially justified or . . . harmless.'" *Lamb v. Montgomery Twp.*, 734 F.App'x 106, 110 (3d Cir. 2018) (quoting Fed. R. Civ. P. 37(c)(1)). For example, justice may not be served should the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties or the failure to list as a trial witness a person so listed by another party be used as a reason to preclude that witness's testimony. Fed. R. Civ. P. 37(c)(1) (Advisory Committee notes to 1993 Amendments). Similarly, if there is a "substantial justification" for failure to abide by the disclosure requirements of the Rules, the Court has discretion to lift the mandatory sanction.

Whether the exercise of such discretion is appropriate is determined by considering the following five factors: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; [] (4) bad faith or willfulness in failing to comply with a court order or discovery obligation," *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000) (citation omitted); and, (5) "the importance of the evidence to the proffering party," *Hill v. TD Bank, NA*, 586 Fed. App'x 874, 879 (3d Cir. 2014). The Third Circuit has cautioned that "exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (internal quotation marks and citations omitted). However, "[e]ven if there is no evidence of bad faith, where an oversight is not rationally explained and is surely prejudicial, exclusion is appropriate." *Mercedes Benz*

*USA LLC*, 2008 WL 4378294, at *4 (citations omitted).

Applying the Third Circuit's five-factor test here, Aetna has not explained why its failure to timely disclose that it sought to recover damages for hospital payments was harmless nor provided a substantial justification for why it failed to disclose this information. Neither the Complaint, which focuses near-exclusively on Mednax's claims for reimbursement and its associated misconduct, nor Aetna's initial disclosures, which broadly stated that Aetna sought to recover "the overpayments that Defendants fraudulently induced Aetna to make," nor Aetna's Rule 30(b)(6) witness called to testify about damages, Richard Harris,[4] specified that Aetna sought to recover hospital payments. During discovery, Aetna repeatedly maintained that hospital claims were irrelevant to the case. Aetna objected to Mednax RFPs 108 and 110 on the grounds that Aetna's clinical claim and utilization review processes "focus[] on" only hospital claims, which were not "claims at issue in this case," and the records sought were "not relevant to the issues in this matter." Aetna similarly objected to RFPs 103, 104, and 107 on the grounds that the "discovery is not relevant, as it relates to Aetna's review of services rendered by the hospital (not by a Mednax physician)." At the close of fact discovery, Aetna refused Mednax's production requests following the Rooker Deposition on the grounds that "Mednax does not submit facility claims" and "Aetna does not seek to recover[] facility claims in this lawsuit."[5]

---

[4] Aetna's conduct is "especially troubling" in part because Mednax specifically pursued information about Aetna's damages calculation through a Rule 30(b)(6) deposition, which Aetna opposed. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006). Aetna contends that Mednax simply failed to ask Aetna's witness, Richard Harris, "how Aetna's damages calculations may have changed since the filing of the Complaint" or "seek further testimony or information from Aetna regarding damages." The deposition transcript suggests Mednax's questioning of Harris concerning Aetna's damages was brief, but it at least shows that Harris was asked about deposition "Topic 24," which pertained to Aetna's damages calculation and how Aetna's damages computation had changed since the Complaint was filed. If the computation had morphed it was Aetna's obligation to timely disclose it. *See Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F.Supp.2d 55, 71 (D.D.C. 2010) ("Defendants cannot be faulted for failing to compel Plaintiffs during the discovery period to produce more specific evidence about a type of damages that was not explained to them in Plaintiffs' initial disclosures . . . or in Plaintiffs' answers to Defendants' questions at their depositions").

[5] Though Aetna accuses Mednax of relying on "cherry-picked communications," Aetna at no point addresses its

Aetna cannot plausibly contest surprise on this record.[6]

Aetna's conduct prejudices Mednax. Because Aetna failed to timely disclose its damages computation and stonewalled Mednax's efforts to discover information regarding payments to hospitals, Mednax was deprived of an opportunity to obtain relevant discovery that could potentially limit its liability for such payments. Mednax also proffers that because it did not know to seek third-party discovery from non-party hospitals, the factual record is silent as to various issues relevant to determining whether Mednax is solely responsible for Aetna's payments of hospital claims. Mednax could have sought these records before the close of fact discovery, or pursued discovery it was previously denied with arguments focused on its liability for Aetna's hospital payments, if Aetna had timely disclosed its damages computation.

Aetna disputes any prejudice, arguing that Aetna timely produced the Cragg Report and its supporting evidence, as well as "considerable discovery" concerning Aetna's review of hospital claims. These arguments are not persuasive. It does not follow from Aetna's disclosures that Mednax had adequate opportunity to develop the factual record to defend itself. Aetna notes that it produced Aetna's policies and guidelines for review of hospital claims, examples of specific utilization and clinical reviews, and that Mednax deposed two corporate

---

representation at the close of fact discovery that Aetna "does not seek to recover[]" hospital payments. It is pure sophistry for Aetna to argue, as it does, that it objected to Mednax's request for documents regarding hospital claims because the question "at issue" in this litigation is whether Mednax's physician claims were fraudulently overbilled not whether hospital stays were fraudulently overbilled. The fact that Aetna seeks to recover on hospital claims ineluctably renders them "at issue."

[6] Aetna contests surprise on the grounds that consequential damages are "well-recognized" as damages attainable for fraud, the Complaint alleged that Mednax's fraud "resulted . . . in inflated payments to hospitals," and Mednax was aware that Aetna would support its damages analysis with expert reports and seek to recover for Mednax's improper extension of the length of patients' stay in the NICU. In light of the ample record showing that Aetna did not disclose, and actually refuted, that it sought to recover hospital payments, these points do not undermine the conclusion that the Cragg Report's announcement of Aetna's pursuit of hospital payments was a surprise. Further, because a NICU patient's prolonged length of stay could result in overpayments to both Mednax *and* hospitals, Mednax's awareness that length of stay was a factual issue in the case does not mean that Mednax had notice of Aetna's hospital payments damages theory. Indeed, the Cragg Report identified length of stay as a source of Aetna's overpayments for both of Aetna's damages theories.

11

representatives about utilization and clinical reviews. This discovery mitigates prejudice to some small degree, but it is not up to Aetna to mete out in discovery what it thinks Mednax should have. Moreover, the prejudice Mednax suffers in not obtaining the information it requested from Aetna regarding hospital claims is amplified by the complexity of the factual and legal issues involved in this case.

Next, the second and third *Nicholas* factors also support exclusion. Mednax cannot cure prejudice without reopening fact discovery, but fact discovery has long since closed. While Aetna's production of materials used for the Cragg Report may inform Mednax's rebuttal expert report, any such report necessarily would rely on an artificially limited factual record. *See Ghulam v. Strauss Veal Feeds, Inc.*, 2002 WL 34381146, at *2 (M.D. Pa. Nov. 5, 2002) (finding prejudice where plaintiff's conduct "hinder[ed] the preparation of expert reports in rebuttal"). Reopening fact discovery is not appropriate here where it would expose Mednax to substantial expense as it revisits discovery requests regarding hospital claims that it previously sought from, but which were roundly rebuffed by, Aetna.

The record suggests that Aetna failed to comply with its discovery obligations in bad faith. As discussed, Aetna objected to Mednax's RFPs on the grounds that the requested documents concerned hospital, not physician, claims, and explicitly represented that it did "not seek to recover[] facility claims in this lawsuit." While there is no sure indication that Aetna intentionally misrepresented its damages computation during fact discovery, it is an unavoidable conclusion that Aetna knew when it served the Cragg Report that the Report contradicted its representations during fact discovery. At a minimum, the factual record offers "no reasonable explanation" for Aetna's failure to timely disclose that it sought to recover hospital payments, nor why Aetna explicitly refuted this theory of recovery only to adopt it a fewer short months

later. *Mercedes Benz USA LLC*, 2008 WL 4378294, at *4.[7]

The final factor, the importance of the evidence sought to be excluded, does not weigh clearly against or in favor of exclusion.  The Cragg Report's calculation of Aetna's hospital payments is undoubtedly important to Aetna's recovery of *all* payments that it alleges Mednax's fraud induced Aetna to make to *any* party.  However, Aetna will still be able to seek recovery of the damages at the heart of this case: the money it was fraudulently induced to paid to Mednax.  *Cf. ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012) (expert testimony critical because "without additional damages calculations, . . . Plaintiffs will be unable to pursue damages").  Although the Third Circuit has referred to "exclusion of critical evidence" as "an extreme sanction," *Konstantopoulos*, 112 F.3d at 719, here exclusion merely binds Aetna to its own long-espoused theory of its case, which it repeated to Mednax's detriment during discovery.

Accordingly, the Court will not exercise its discretion to lift the mandatory sanction of Rule 37.  In light of the foregoing, the appropriate sanction for Aetna's failure to comply with Rule 26 is to preclude Aetna from introducing evidence in support of any recovery of hospital payments.

Mednax has, however, requested more in its motion than just the preclusion of "evidence" regarding hospital claims.  It specifically seeks to strike any theory that calculates damages for alleged overpayments that Aetna made to hospitals at which Mednax-managed physician groups were stationed.  Aetna argues that this request is improper in that Rule 37(c)(1)

---

[7] Aetna argues here that it was "transparent" that it would "articulate its claims through its experts, and that its regression analysis would be refined and expanded upon beyond that alleged in its complaint by those experts."  If Aetna is arguing that it always knew it would announce its pursuit of hospital payments in an expert report, then Aetna's failure to timely disclose this damages theory seems willful.  And if Aetna did *not* know until after fact discovery that it would seek such damages, Aetna's expectation that it would rely on future experts does not explain why Aetna refuted during fact discovery the damages theory its expert adopted shortly thereafter.  Further, the Complaint's statistical analysis, which "adjusted for or ruled out" Mednax patient's longer length of stay to explain Mednax's inflated billing, does not focus on hospital payments.  Accordingly, the Cragg Report is not fairly characterized as an expansion or refinement of the Complaint's statistical analysis.

only permits the sanction of the preclusion of evidence, not the exclusion of a legal theory.

As a preliminary matter, although the parties are not wrong as a general matter to describe Aetna's pursuit of hospital payments as a damages theory, it is for purposes of Rule 26(a) a damages *computation*, which Aetna was required to timely disclose or risk sanction for "fail[ure] to provide information . . . as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1).

Quite separately, Mednax's specific request for relief is not dispositive as to what sanction ultimately will be appropriate. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007) ("any determination as to what sanctions are appropriate [is] entrusted to the discretion of the district court"); *Reed v. Binder,* 165 F.R.D. 424, 431 (D.N.J. 1996) ("the language of Rule 37(c)(1) gives the court broad discretion to fashion a remedy"); *see also, e.g., Nicholas,* 227 F.3d at 148 (affirming district court's sanction precluding plaintiff "from introducing any evidence of future lost earnings at the damages phase" of trial). Indeed, even where a party does not explicitly move for the imposition of alternative "appropriate sanctions" pursuant to Rule 37(c)(1)(C), Rule 37 permits the award of such alternative sanctions *sua sponte*. *See Pitts v. HP Pelzer Auto. Sys., Inc.,* 331 F.R.D. 688, 698 (S.D. Ga. 2019) (Rule 37 "allows the Court to award alternative, appropriate sanctions following a motion to preclude evidence pursuant to Rule 37(c)(1)," and "a party need not request sanctions additional to or instead of exclusion before a court may award alternative sanctions.").

Certainly, Rule 37 permits as a discovery sanction the exclusion of a legal theory, at least in conjunction with or as an effect of the exclusion of evidence supporting the theory. *See, e.g., United Healthcare Servs.*, 2019 WL 2994660, at *12 (excluding expert testimony and thus precluding plaintiff from "produc[ing] an expert that vastly expands its causation theory"); *Astrazeneca AB*, 278 F.Supp.2d at 508-09 (precluding defendant from "presenting its evidence

14

and theories" about the validity of a patent at issue in the litigation). This approach is consistent with Rule 37's text, which provides that "[i]n addition to or instead of" excluding evidence the Court "may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)," which includes such muscular sanctions as "prohibiting the disobedient party from supporting or opposing designated claims or defenses," Fed. R. Civ. P. 37(b)(2)(A)(ii), and "striking pleadings in whole or in part," Fed. R. Civ. P. 37(b)(2)(A)(iii).

### III.    CONCLUSION

Although Rule 26(a)(1)(A)(iii) required Aetna to provide in its initial disclosures a "computation of each category of damages" it claimed, Aetna's initial disclosures did not specify that Aetna sought damages for hospital payments. Nor did Aetna "supplement or correct its disclosure . . . in a timely manner" as required by Rule 26(e)(1)(A). Instead, Aetna repeatedly flouted its Rule 26 obligation to inform Mednax that it sought hospital payments as a portion of its damages. Although the Special Master directed Aetna to produce a witness to testify about the basis for its damages, Aetna's witness did not testify that Aetna sought to recover hospital payments. In its responses to requests for production, inter-party correspondence, and before the Special Master, Aetna repeatedly opposed during fact discovery Mednax's requests for production of materials relevant to Aetna's review of hospital claims on the grounds that only payments to Mednax, not payments to hospitals, were at issue in the case. And, at the close of fact discovery, Aetna refused Mednax's supplementary request for production following the deposition of one of Aetna's clinical claim review managers on the grounds that Aetna "does not seek to recover[]" hospital claims. On this record of Aetna's conduct during discovery, Rule 37 does not permit Aetna to now seek damages for hospital payments. Accordingly, Mednax's motion to strike will be granted.

An appropriate order follows.

                                                **BY THE COURT:**

                                                **/s/Wendy Beetlestone, J.**
                                                _____
                                                **WENDY BEETLESTONE, J.**