## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AETNA, INC. et al.,<br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>MEDNAX, INC., et al.,<br>　　　　　　　Defendants. | CIVIL ACTION<br><br><br><br><br>NO.  18-2217 |

### MEMORANDUM OPINION

This suit concerned allegedly fraudulent billing practices related to the provision of neonatal medical services.  After protracted discovery, the case settled.  Defendants now bring an unopposed motion to permanently seal certain documents that were attached to its summary judgment motion.  Given the Third Circuit's decision in *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662 (3d Cir. 2019), it is improper to grant the motion, even as unopposed, absent an analysis of the documents which the Defendant seeks to seal in light of the public's interest in access to those documents. For the reasons that follow, Defendants' Motion will be granted.

### I.    BACKGROUND

Defendants (Mednax Inc., and its affiliates Mednax Services, Inc. and Pediatrix Medical Group, Inc., collectively referred to as "Mednax") provide neonatal care at hospitals across the United States through their affiliated medical practices.  Mednax competes with other local and national physician practices to obtain and keep hospital contracts and uses its own data about billing and patient care in the contract negotiations.

Mednax physicians provide services to patients across the country, and the patients hold health insurance from a variety of providers.  To ensure that its physicians can serve as in-

network healthcare providers, Mednax enters into contracts with payors.  Mednax currently has approximately 600 unique contracts with health insurance companies.  The negotiated rates in those contracts vary.  Mednax does not share its negotiated rates with the public or third parties.

Plaintiffs (Aetna Inc., Aetna Life Insurance Company, Aetna Health Management, LLC, and Aetna Health, Inc., collectively referred to as "Aetna") provide insurance coverage for the medical services provided by Mednax-affiliated clinicians to members of Aetna's health plans and other covered beneficiaries.  Mednax bills Aetna for its services by submitting claim forms that use Current Procedural Terminology ("CPT") codes to identify the medical services it has provided.  The Complaint alleged that Mednax engaged in a fraudulent scheme to overbill Aetna for its services by using inflated CPT codes.

Mednax denied these allegations and, after a lengthy discovery period, filed a Motion for Summary Judgment.  Mednax moved to file under seal for 120 days nineteen attachments to the Motion on the grounds that they contain "highly sensitive and competitive information about the non-public rates negotiated between Aetna and Mednax for NICU ["Neonatal Intensive Care Unit"] services."  The Motion was granted.

The temporarily sealed documents included unredacted copies of five expert reports that Defendants have publicly filed on the docket in redacted form.  Defendants now seek to permanently seal the unredacted copies.

## II.    LEGAL STANDARDS

### A.  Common Law Right of Access

Under the federal common law, "[t]here is a presumptive right of public access to pretrial motions of a nondiscovery nature . . . and the material filed in connection therewith." *In re Avandia Mktg.*, 924 F.3d at 672 (quoting *In re Cendant Corp.*, 260 F.3d 183, 192-93 (3d Cir.

2001)); *Republic of the Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 664 (3d Cir. 1991)

(holding that this common law right applies to "materials filed in connection with [defendant's]

motion for summary judgment").

This right is not, however, absolute. *In re Avandia Mktg.*, 924 F.3d at 672. "The party

seeking to overcome the presumption of access bears the burden of showing 'that the interest in

secrecy outweighs the presumption.'" *Id*. (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel

Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986)). To make this showing, the movant must

demonstrate: (1) "that the material is the kind of information that courts will protect"; and, (2)

"that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id*.

(quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)).

The public interests served by the common law right of access include the promotion of

public health and safety; the encouragement of integrity among counsel and their clients; the

provision of information in cases with a "public" character; public education about the judicial

system; the legitimacy of the judiciary's decisions; and, the public's contemporaneous review of

the basis of important judicial decisions. *Westinghouse Elec. Corp.*, 949 F.2d at 664. Other

interests include the public's confidence in the judicial system; the avoidance of "injustice,

incompetence, perjury, and fraud"; and the public's perception of fairness. *In re Avandia Mktg.*,

924 F.3d at 672 (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988)).

"In delineating the injury to be prevented, specificity is essential. Broad allegations of

harm, bereft of specific examples or articulated reasoning, are insufficient." *Id*. at 673 (quoting

*In re Cendant Corp.*, 260 F.3d at 194) (citation and internal quotation marks omitted).

Harm to "competitive standing" *may* constitute an injury sufficient to justify sealing

judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (courts may use

their supervisory power over their own records to deny access "where court files might become a vehicle for improper purposes," including "as sources of business information that might harm a litigant's competitive standing"); *see also Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir. 1993) ("Documents containing trade secrets *or other confidential business information* may be protected from disclosure.") (emphasis added).  The movant must identify "current evidence to show how public dissemination of the pertinent materials now would cause the competitive harm it claims."  *Westinghouse Elec. Corp.*, 949 F.2d at 663 (two-year old affidavit did not suffice to support allegations of competitive harm).

Nevertheless, "business information alleged to be confidential 'is not entitled to the same level of protection from disclosure as trade secret information.'" *Id*. at 663 (quoting *Littlejohn*, 851 F.2d at 685).  "[C]oncern about a company's public image, embarrassment, or reputational injury, without more, is insufficient."  *In re Avandia Mktg.*, 924 F.3d at 676; *Littlejohn*, 851 F.2d at 685 (private commercial interest in secrecy that "stem[med] primarily from a desire to preserve corporate reputation" held little weight in balancing analysis).

To determine whether the movant has carried its burden, the court must "conduct[] a document-by-document review," *In re Avandia Mktg.*, 924 F.3d at 673 (alteration in original) (quoting *Leucadia, Inc.*, 998 F.2d at 167), "articulate the compelling, countervailing interests to be protected," and "make specific findings on the record concerning the effects of disclosure." *Id*. at 672 (internal quotation marks omitted) (quoting *In re Cendant Corp.*, 260 F.3d at 194). "The balancing of the factors for and against access is a decision committed to the discretion of the district court."  *Bank of Am.*, 800 F.2d at 344.

### B.  First Amendment Right of Access

The First Amendment also grants a public right of access to civil trials.  *In re Avandia*

*Mktg.*, 924 F.3d at 673.[1]  As under the common law, this right is not absolute.  *Publicker Indus.,*

*Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984).  The First Amendment presumption,

however, can only be overcome by a "much higher showing" than that required by the common

law, *In re Avandia Mktg.*, 924 F.3d at 673 (quoting *In re Cendant Corp.*, 260 F.3d at 198 n.13),

because any restriction on that fundamental right will be "evaluated under strict scrutiny."  *Id.*

(quoting *PG Publ'g Co. v Aichele*, 705 F.3d 91, 104 (3d Cir. 2013)).  Thus, a limitation on the

public's constitutional right of access may be imposed only upon demonstration of "an

overriding interest [in excluding the public] based on findings that closure is essential to preserve

higher values and is narrowly tailored to serve that interest."  *Id.* at 1071 (quoting *Press-Enter.*

*Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510 (1984).  "The overriding interest

can involve the content of the information at issue, the relationship of the parties, or the nature of

the controversy."  *Id.* at 1073.

      The initial evidentiary showing required is the same as under the common law, namely

that (1) "the material is the kind of information that courts will protect" and (2) "that disclosure

will work a clearly defined and serious injury to the party seeking closure."  *Id.* at 1071.[2]  "The

injury must be shown with specificity."  *Id.*  Provided there is a "sufficient threat of irreparable

---

[1] Although the Third Circuit has not yet decided whether the First Amendment right of access applies to summary judgment records, it is assumed to apply for the purposes of this Memorandum Opinion.  Mednax invoked this standard in its Motion, and the *Avandia* dissent posited that the majority should have reached that question and should have joined the Second and Fourth Circuits in holding that the First Amendment applies to such records.  *In re Avandia Mktg.*, 924 F.3d at 682-83 (Restrepo, J., concurring in part and dissenting in part) (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006) and *Rushford v. New Yorker Mag. Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)).

[2] Although the Third Circuit articulated the two requirements slightly differently, they boil down to the same thing. Under the common law, the movant must show "that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Avandia Mktg.*, 924 F.3d at 672 (quoting *Miller*, 16 F.3d at 511).  Under the First Amendment, the movant must show "that the material is the kind of information that courts will protect and that there is *good cause* for the order to issue," where "good cause" is defined as meaning "that disclosure will work a clearly defined and serious injury to the party seeking closure."  *Publicker Indus.*, 733 F.2d at 1071 (emphasis added).

harm," a party's "interest in confidential commercial information," including but not limited to trade secrets, can satisfy this test. *Id.* However, as under the common law, a company is not entitled to protect the secrecy of its own poor management or bad business practices. *Id.* at 1074.

The public interests undergirding the First Amendment right include: (1) "enhanc[ing] the quality and safeguard[ing] the integrity of the factfinding process"; (2) foster[ing] an appearance of fairness"; (3) "heighten[ing] public respect for the judicial process"; and, (4) "permit[ting] the public to participate in and serve as a check upon the judicial process." *Publicker Indus., Inc.*, 733 F.2d at 1070 (quoting *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982)).

In reviewing a motion to seal under the First Amendment, the district court "must both articulate the countervailing interest it seeks to protect and make 'findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 1071 (quoting *Press-Enter. Co.*, 464 U.S. at 510).

## III.  DISCUSSION

Mednax acknowledges that the public's right to access the unredacted expert reports but contends that the competitive harm that disclosure would wreak upon Mednax and its affiliates outweighs that presumption, with respect to two discrete types of information: (1) Mednax's negotiated rates for various neonatal CPT codes; and (2) data related to the acquisition of neonatal physician practices by Mednax affiliates.

### C.  Negotiated Rates

Mednax, relying on the Declaration of Daniel Corcoran, its Senior Vice President for Managed Care and Payor Contracting for Mednax Services, Inc. (ECF No. 316-5), maintains that the disclosure of its negotiated rates would put health insurance companies at an advantage in

6

their ongoing and future negotiations with Mednax by informing them of "the rates that their competitors have paid Mednax for physician services." Corcoran contends that the impact on Mednax would be "significant and adverse" because Mednax would "face serious challenges in rate negotiations and would likely suffer economic harm." In its Motion, Mednax acknowledges that some "of the rates in the expert reports represent the average or median rates across multiple practices or over several years," but argues that this fact would not "notably lessen[]" the resulting harm because Aetna's competitors "can deduce valuable information" from such composite rate information and use it to their advantage in negotiations with Mednax.[3]

### i.  Common Law

Under the common law, access to the unredacted expert reports would serve the public's interest in encouraging integrity among counsel and their clients. Access would also foster the public's understanding of, and confidence in the judicial system and its perception of fairness, by furthering the transparency of the judicial process. In addition, the implications of this case extend beyond the parties' private dispute—the Complaint alleges that Mednax settled a False Claims Act suit with the federal government in 2006—without conceding liability—concerning its neonatal coding practices. Mednax also acknowledges in the Statement of Undisputed Material Facts submitted at summary judgment that it entered into a Corporate Integrity Agreement with the United States on matters related to neonatal coding and billing practices in 2006. The involvement of the United States Government in matters arising from the same subject matter lends this case a public character that bolsters the public's interest in being informed.

---

[3] Corcoran's Declaration also demonstrates an awareness that some of the rates are averages, and that fact does not affect his estimation of the harm that would result from disclosure.

Mednax correctly alleges that the redacted rates constitute material of the kind courts will protect because it constitutes competitive commercial information.  *See Nixon*, 435 U.S. at 598; *Leucadia, Inc.*, 998 F.2d at 166.  Mednax has also provided contemporaneous evidence through the Corcoran Declaration that disclosure of this data would inflict a clearly defined and specific injury on Mednax—specifically, injury to its future negotiations with Aetna's competitors by the disclosure of the rates Mednax previously negotiated with Aetna.

Balancing these concerns, Mednax has carried its burden of showing that its interest in secrecy outweighs the public interest in access to the rate information contained in the expert reports under the common law.  Mednax has alleged a legitimate competitive interest and it does not appear that Mednax's real concerns are reputational.  On the contrary, the redactions cover only rate data, while the experts' reasoning and the CPT codes at issue remain in public view.[4] These limited redactions weigh in Mednax's favor because a party seeking to seal an "entire record faces an even heavier burden" than one seeking to seal only a portion.  *Miller*, 16 F.3d at 551.  They preserve the essential transparency of the judicial process and ensure that the experts' debate may be understood by the public.

### ii.   First Amendment

Under the First Amendment, the public has an interest in the integrity of the factfinding

---

[4] *See, e.g.*, Jena I, at JA1855, 1875 (explaining the purpose of Exhibit 2 and the calculations underlying it, but redacting the rates associated with each CPT code); Duh Rep., at JA1981-82 (explaining that "the rate agreements between Aetna and Mednax . . . dictate higher dollar amounts to be used for higher-severity E/M codes," but redacting the rates associated with each CPT code); Cragg I, at JA2071–72 (explaining that "Table 5 confirms that, on average, Mednax receives higher reimbursements for billing intensive and critical care E/M procedures as opposed to newborn and hospital E/M procedures," but redacting the rates associated with each CPT code); *Id.*, JA2096-2105 (explaining in detail how the expert calculated the composite reimbursement amounts contained in Table 5, but redacting the rates associated with each CPT code); Cragg II, at JA2231-32 (critiquing the sampling methodology adopted by Mednax's expert, Dr. Borck, and redacting the amount charged for patient stays); Jena II, at JA2323-24, JA2366-67 (explaining critique of Dr. Cragg's methodology for calculating the "average reimbursements per day by revenue code for Mednax NICU stays" and redacting from the supporting charts the amount charged per day).  "E/M" codes are a type of CPT code.

process, the appearance of fairness, respect for the judicial process, and participation in the judicial process.  Mednax's interest in the confidentiality of its commercial information may suffice to overcome these interests if Mednax has alleged a sufficient threat of irreparable harm, such that "closure is essential" and "narrowly tailored" to serve Mednax's countervailing competitive interest.  *Publicker Indus., Inc.*, 733 F.2d at 1073.

Here, Mednax alleges that it has about "600 unique contracts with health insurance companies," the ongoing and future negotiation of which would be significantly and adversely impacted by the disclosure of Mednax's rates (whether actual, median, or average).  The only way to prevent competing payors from learning of these rates is by redacting the expert reports.  As noted above, the redactions do not obscure the experts' reasoning or the CPT codes applied by Mednax, which are central to Aetna's allegations.  The redactions are, in other words, narrowly tailored to serve Mednax's interest in keeping its rates confidential.  Therefore, the permanent sealing of the negotiated rate data contained in the expert reports would not offend the First Amendment.

### D.  Acquisition Data

Mednax also seeks to protect data related to its acquisition of neonatal practices, including for example, "the names of the acquired practice groups, the hospitals they service, the number of neonatal admissions pre- and post-acquisition and differences in reimbursement pre- and post-acquisition."[5]

Relying on the Declaration of Mary Ann E. Moore, Senior Vice President and Chief Legal Office–Operations at Mednax Services, Inc. (ECF No. 316-7), Mednax lists a number of

---

[5] Only the Jena I, Jena II, and Cragg II reports contain such acquisition data.

competitive harms that would allegedly result from the disclosure of this data: (1) "provid[ing] contracting hospitals with information relevant to Mednax's billing and profitability at individual hospitals . . . could adversely affect Mednax's ability to negotiate favorable terms in its hospital contracts"; (2) "detailed information regarding billing, admissions and length of stay could also be used by Mednax's competitors to . . . undercut Mednax in negotiations with hospitals, which would cause serious financial harm to Mednax"; and, (3) "[d]isclosure of information provided by previously acquired practices may make future acquisition targets reluctant to disclose their data to Mednax, and thus interfere with Mednax's ability to perform due diligence of target practices' billing and care prior to acquisition," which could in turn force Mednax "to forego acquisitions that it would otherwise pursue, leading to negative financial consequences."

### iii.    Common Law

The public interests involved here resemble those related to the first category of information: the integrity of counsel and parties, the public's understanding of and confidence in the judicial system, and the perceived fairness of the system.  The link to the case's public character appears weaker, however, because the acquisition data is not related to the fraudulent billing allegations that prompted the government's prior involvement.

As with the first category, this data is sensitive commercial information that courts will protect under the right conditions.  Mednax has an especially strong interest in preventing the disclosure of the list of hospitals that it staffs because such information—as noted by Mednax— is akin to customer lists, which are a type of trade secret.[6]  Furthermore, the specific

---

[6] "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.  It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers."  Restatement of Torts § 757 cmt. b (1939); *see also Felmlee v.*

consequences that could arise from disclosure, as described by Moore, articulate a clearly defined and serious competitive injury to Mednax, related to both its contract negotiations with hospitals and its ability to acquire new practice groups.  There is no indication that Mednax is trying to protect its reputation or cover up bad practices.

Mednax has overcome the presumption of access.  As with the first category, the limited nature of the redactions is critical.  Mednax blotted out all identifying facility information, while leaving the data pertaining to those facilities visible.[7]  Thus, the reader can still glean from the reports relevant information such as billing data,[8] patient data,[9] and the experts' calculations.[10] These custom redactions would enable the public to understand the experts' analysis and the allegations against Mednax, and still protect Mednax's competitively sensitive information by making it impossible to associate the sensitive data with any particular facility or practice group.

### iv.    First Amendment

Under the First Amendment, the public has the same interests in accessing this category of information as it did the prior one.  As noted in the common law analysis above, Mednax has

---

*Lockett*, 351 A.2d 273, 277 (Pa. 1976) (applying Restatement of Torts § 757) (citing *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 775 (Pa. 1965)).

[7] *See, e.g.*, Jena I, at JA1949 (redacting from table listing facilities included in Mednax's due diligence financial models the acquisition name, date, city, state, financial model spreadsheet facility name, and end date, leaving visible the count of NICU daily E/M codes, and the applicable period).

[8] *See, e.g.*, Jena I, at JA1856 (describing the financial model that Mednax used in conducting due diligence prior to acquisitions and explaining that some facilities, the names of which are redacted, provided pre-acquisition coding data for a period less than twelve months).

[9] *See, e.g.*, Cragg II, at JA2248-49 (explaining that "government payer  patients predominate the claims data that underlie Dr. Jena's acquisitions analysis," and redacting from supporting table the names and acquisition dates of the practices analyzed but leaving the corresponding percentage of government payer patients).

[10] *See, e.g.*, Jena II, at JA2299, JA2343-45 (explaining Exhibit 14, which critiques the methodology deployed by Dr. Duh to characterize patient stays as "Mednax" or "non-Mednax," and displaying that analysis in graphic form, redacting only the name of the specific facilities associated with the data).

again articulated a specific competitive injury that would result from the disclosure of sensitive commercial information protectable by the courts.

Mednax has made the "much higher showing" required under the First Amendment for this category of information because the redactions Mednax applied to protect its information are narrowly tailored to serve Mednax's interest in the secrecy of its competitive information, and essential to the preservation of that interest.  Indeed, there appears to be "no less restrictive way," *Publicker Indus.*, 733 F.2d at 1070, that Mednax could protect this data.  The redactions obscure only the identifying information of the specific practice groups at issue, leaving the data itself open to public scrutiny.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

12